## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**JONATHAN BOBNAR,**                              **CASE NO. 1:22-cv-2258**

                              **Plaintiff,**

              **-vs-**                            **JUDGE PAMELA A. BARKER**


**ASTRAZENECA PHARMACEUTICALS
LP,**                                             **MEMORANDUM OPINION AND
                                                  ORDER**

                              **Defendant.**


        This matter is before the Court on Plaintiff Jonathan Bobnar's ("Bobnar") Motion for Partial

Summary Judgment (Doc. No. 33), filed on May 1, 2024, to which Defendant AstraZeneca

Pharmaceuticals LP ("AstraZeneca") filed an Opposition on May 31, 2024 (Doc. No. 39).  Bobnar

filed a Reply in support of his Motion on June 6, 2024.  (Doc. No. 40.)

        Also pending is AstraZeneca's Motion for Summary Judgment (Doc. No. 36), filed on May

6, 2024, to which Bobnar filed an Opposition on May 21, 2024 (Doc. No. 37).  AstraZeneca filed a

Reply in support of its Motion on June 11, 2024.  (Doc. No. 41.)

        For the following reasons, the Court **GRANTS** Bobnar's Motion for Partial Summary

Judgment (Doc. No. 33) and **GRANTS IN PART** and **DENIES IN PART** AstraZeneca's Motion

for Summary Judgment (Doc. No. 36).

## I.    Undisputed Material Facts[1]

---

[1] In their statements of facts, the parties cite to Bobnar's testimony given in response to questions about, for example, additional specifics concerning his beliefs.  (Doc. Nos. 33-1, 36-1.)  While the Court recognizes that the parties' statements of facts in large part accurately reflect the record, in determining whether AstraZeneca discriminated against Bobnar based on his religion, the Court is constrained to consider only the information that AstraZeneca "knew at the time of [his termination]."  *Cousin v. United States*, 230 F. Supp. 3d 475, 490 (E.D. Va. 2017) ("[A]s in other employment discrimination contexts, the Court's task is to assess the employment decision from the perspective of the employer at the

The record demonstrates that there are no genuine issues of material fact.  The material facts are set forth below.

### A.    AstraZeneca and the Vaccine Mandate

AstraZeneca is a global pharmaceutical company that, in pertinent part, markets and sells pharmaceutical products.  (Nichols Dep. (Doc. No. 34-1) at Tr. 16–17.)  At the time of Bobnar's termination from AstraZeneca in 2022, AstraZeneca's United States-based operations had an Equal Employment Opportunity Policy ("EEO Policy").  (Bobnar Dep. (Doc. No. 44-1) Ex. 21; Bobnar Dep. at Tr. 220.)  AstraZeneca's EEO Policy provided that AstraZeneca "and its employees are prohibited from: Engaging in discrimination; [] Condoning or encouraging discrimination[; or ] Engaging in retaliation."  (Bobnar Dep. Ex. 21 at PageID# 1533.)  AstraZeneca's EEO Policy defined "discrimination" as "any decision relating to the terms or conditions of an individual's employment

---

time the decision was made.") (citing *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)); *Grace v. Ansul, Inc.*, 2001 WL 765132, at *3 (N.D. Ill. July 6, 2001) ("It is of course the universally-established law that it is the honest perception of the decisionmaker at the time of an adverse employment decision that controls whether or not prohibited discriminatory motives are at work."); *Turner v. Kan. City So. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012) ("The relevant perspective is that of the employer at the time of the adverse employment decision.") (citation omitted); *Warren v. Hollingsworth Mgmt. Servs., LLC*, 2022 WL 72477, at *12 (E.D. Mich. Jan. 6, 2022) (examining "the plaintiff and comparators' conduct and surrounding circumstances from the perspective of the employer at the time it took the adverse action" in race discrimination claim); *Bertsch v. Overstock.com*, 69 F. Supp. 3d 1245, 1270 (D. Utah 2014) ("This court is instructed to evaluate the facts from the perspective of the employer at the time of the adverse employment decision."); *Benitez v. Tyson Fresh Meats, Inc.*, 2022 WL 1283087, at *19 n.45 (M.D. Tenn. Apr. 28, 2022) (noting that, in a Title VII case, "the employer meets its burden of production only if it presents not merely some statement of what the employer now says the reason was, but rather evidence of what the reason actually was at the time in question"); *Prach v. Hollywood Supermarket, Inc.*, 2010 WL 3419461, at *5 (E.D. Mich. Aug. 27, 2010) (assessing reasonableness of accommodation "according to the facts as they existed at the time of the plaintiff's employment"); *Chandler v. Volunteers of Am., Se., Inc.*, 126 F. Supp. 3d 1216, 1232 (N.D. Ala. 2015) (issue of fact as to retaliation where defendant's employee "only discovered [plaintiff's] alleged violation *after* [plaintiff's] discharge" (emphasis in original)); *Hoff v. Performance Food Grp., Inc.*, 2009 WL 4672732, a *3 (C.D. Ill. Dec. 1, 2009) (finding employer lacked knowledge of disability where "his deposition testimony revealed that he was unable to walk more than 150 feet without resting" because plaintiff did not make physical limitation known to defendant at time of termination); *Garcia v. T-Mobile USA, Inc.*, 2009 WL 10696443, at *2 n.4 (D.N.M. Jan. 9, 2009) ("Because the alleged misrepresentation was only revealed during discovery, it could not have been a basis for Garcia's firing and is therefore not material."); *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004) (citing prior case in which "comments made by decisionmakers before or near the time they make a challenged employment decision were held to be sufficient to sustain a plaintiff's discrimination claims").  Therefore, for purposes of evaluating Bobnar's Title VII claims, the Court will not consider the cited testimony to the extent that it introduces new facts not known to AstraZeneca at the time of Bobnar's termination.

with, or performance of work for, AstraZeneca which is based upon, or influenced by, the individual's

. . . religion . . . ."  (*Id.* at PageID# 1531.)  AstraZeneca's EEO Policy defined "retaliation" as an

action taken with the purpose or effect of "adversely affecting his or her status or conditions of

employment as a company employee, because he or she has, in good faith, exercised rights or fulfilled

obligations under [the] policy, such as by reporting or opposing any conduct prohibited by this policy

. . . ."  (*Id.* at PageID# 1532.)

The EEO Policy instructed employees to "promptly report any incidents of discrimination or

retaliation that [they] have been subjected to, have become aware of, or have observed."  (*Id.*)  The

EEO Policy further encouraged employees to "feel[] comfortable reporting the prohibited conduct to

his or her supervisor." (*Id.* at PageID# 1533.)  The Policy noted that AstraZeneca would investigate

all reports of violations of the Policy "in a fair, timely, and thorough manner."  (*Id.* at PageID# 1534.)

AstraZeneca began requiring employees to disclose to AstraZeneca their vaccination status in

mid-2021.  (Nichols Dep. at Tr. 173–74.)  However, AstraZeneca's internal document, "Reactive

Guidance for Customer-Facing Personnel," informed employees that they had discretion to complete

or comply with a customer's request for proof of their individual vaccination or testing status.  (Wood

Dep. (Doc. No. 34-2) Ex. A; Wood Dep. at Tr. 33.)

On January 31, 2022, AstraZeneca's North American Governance Committee ("Governance

Committee") announced that AstraZeneca's United States-based employees would be required to

receive a vaccine for COVID-19 ("the Mandate").  (Nichols Dep. at Tr. 172; Nichols Dep. Ex. K at

PageID# 576.)   The Governance Committee announced that AstraZeneca's United States-based

employees would be "asked to provide proof of vaccination."  (Nichols Dep. Ex. K at PageID# 576.)

The announcement provided that it was AstraZeneca's "intention [] to move as close as possible to

3

all employees being vaccinated" to "ensure the safety of our employees and of our workplaces, the

Healthcare Providers [HCPs] we work with and patients."  (*Id.*)  Importantly, the announcement

outlined an accommodation process:

> Individuals who are unable to receive a COVID-19 vaccine based on applicable law, such as those who cannot get vaccinated due to a medical or religious reason, can submit a request for a reasonable accommodation regarding the vaccination requirement. Unvaccinated employees seeking a reasonable accommodation will be required to submit a formal request, along with appropriate supporting documentation. AstraZeneca will closely review each request and may require additional information after reviewing the initial request. . . . Details about how to apply for an accommodation will be provided in a separate email.

> For employees who are not vaccinated and who are granted an exemption to the vaccine requirement for qualifying reasons, the primary accommodation will remain weekly COVID-19 PCR testing. This is required for those entering any AstraZeneca US site or operating in any field-based role.

(*Id.*)  Lastly, the announcement provided that "[f]ailure to comply with the vaccination mandate

or with the terms of any approved accommodation will result in disciplinary action up to and

including termination of employment."  (*Id.*)

As indicated by the Governance Committee's announcement, on February 15, 2022,

AstraZeneca's Human Resources Department ("HR")[2] sent to all U.S.-based employees an email

containing instructions on how to either provide proof of full vaccination (for vaccinated employees)

or to request an exemption (for unvaccinated employees).  (Criddle Dep. (Doc. No. 34-3) Ex. C;

Criddle Dep. at Tr. 31–32; Bobnar Dep. at Tr. 223–24.)  The email explained that employees who

were not fully vaccinated at the time of the email were "required to be fully vaccinated or seek a

medical, religious or applicable state exemption" and fully complete any exemption request by

---

[2] Nichols' team, as well as Andrea Criddle, a People Services Lead at AstraZeneca, administered the mailbox from which the email originated. (Criddle Dep. at Tr. 31–32.)

February 28, 2022.  (Criddle Dep. Ex. C at PageID# 682).  The email further advised that "members of the [Human Resources] and [Safety, Health, & Environment] teams will not be able to assist with individual circumstances regarding exemptions."  (*Id.* at PageID# 681; Criddle Dep. at Tr. 33).  The email additionally provided that "[e]ach exemption request will be carefully considered in compliance with applicable laws."  (Criddle Dep. Ex. C at PageID# 681.)

As to the religious accommodation requests, the email instructed employees to fill out and provided a link for a Religious Accommodation Request Form ("Request Form") and directed employees to send a completed form to AstraZeneca via email.  (*Id.* at PageID# 682.)  The email also restated that, if an accommodation is granted, the accommodation will take the form of weekly COVID-19 PCR testing.  (*Id.*)  If an employee did not comply with the vaccination mandate by March 31, 2022, or with the terms of any approved accommodation, the email advised employees that they would be subject to "disciplinary action up to and including termination of employment."  (*Id.*; Criddle Dep. at Tr. 35.)  Bobnar, as an AstraZeneca employee, understood that as of February 15, 2022, if he did not prove that he was vaccinated or receive an approved exemption, he would be separated from AstraZeneca.  (Bobnar Dep. at Tr. 223.)

AstraZeneca's Request Form, titled "The Religious Reasonable Accommodation Form," indicated that AstraZeneca has "obligations to provide appropriate reasonable accommodation to qualified persons whose sincerely held religious beliefs prohibit them from getting a COVID-19 vaccine."  (Bobnar Dep. Ex. 25 at PageID# 1545.)  The Request Form explained that completion of the form was "the first step in an interactive process" by which AstraZeneca would "determine whether [the employee was] qualified for a reasonable accommodation and further whether there

5

[were] any available accommodations that would enable [the employee] to perform [his job] . . . and meet [AstraZeneca's] operational and safety needs."  (*Id.*; Bobnar Dep. at Tr. 229–30.)

AstraZeneca's Request Form asked employees to: (1) "describe the nature of [their] objection(s) to [AstraZeneca's] COVID-19 vaccination requirement"; (2) state "[h]ow long [they] have [] held the religious belief underlying [their] objection," along with the "name of [their] religion" and whether they are "a member of a place of worship (church, synagogue, mosque, etc.)"; (3) "explain how the religious belief that prevents [them] from receiving the COVID-19 vaccine affects other areas of [their] li[ves,] [f]or example, [whether they] have [] received other vaccines in the past," and "[i]f so, [] explain how [their] religious belief prevents [them] from getting the COVID-19 vaccine but not other vaccines"; and (4) whether they have "ever requested a religious accommodation previously, either on [their] own behalf or on behalf of a family member, such as a child who was subject to a school's vaccination requirements."  (Bobnar Dep. Ex. 25 at PageID# 1545–46.)  The purpose of the third question was not to find a "conflict" between an employee's religious beliefs and the COVID requirement, but rather to understand and "have more context" as to the "actual religious tenet belief that actually prevents getting the COVID-19 vaccine."  (Nichols Dep. at Tr. 38–39.)

The Request Form also invited employees to "attach any supporting documentation that may be helpful in evaluating [the Request Form]," which "may include a website with information on [their] religious beliefs or practices, or a letter from a religious leader describing [their] specific religious beliefs and/or the tenets of the religion that limits or restricts [them] from being vaccinated" (Bobnar Dep. Ex. 25 at PageID# 1546.)  According to Nichols, the questions in the Request Form allowed for "quite a bit of latitude" for employees to describe the nature of their religious beliefs.

6

(Nichols Dep. at Tr. 160.)   Lastly, the Request Form required employees to verify that they understood the request may not be granted "if the request is not reasonable, if it poses a direct threat to the health and/or safety of others and/or to [them], or if it creates an undue hardship" for AstraZeneca.  (Bobnar Dep. Ex. 25 at PageID# 1546.)

At all times relevant to this dispute, Andrew Nichols ("Nichols") was AstraZeneca's "Head of People Services – Americas."  (Nichols Dep. Ex. J. at ¶ 1.)  Nichols was responsible for around 15,000 AstraZeneca employees, or nearly 80% of its total 80,000 headcount.  (Nichols Dep. at Tr. 16, 18.)  Nichols is involved with AstraZeneca's Human Resources team ("HR"), managing "a lot of the execution work for HR."  (Nichols Dep. at Tr. 17.)  Nichols made the final decision as to whether to approve or deny COVID-19 vaccine accommodation requests. (Nichols Dep. Ex. J. at ¶ 12; Nichols Dep. at Tr. 177–78.)  In making these decisions, Nichols reviewed guidance from the United States Centers for Disease Control and Prevention, the Equal Employment Opportunity Commission, "other public health authorities," and AstraZeneca's attorneys. (Nichols Dep. Ex. J. at ¶ 12; Nichols Dep. at Tr. 96, 178.)  Nichols evaluated each Request Form that AstraZeneca received and, based on the above guidance, "would make the decision on whether the individual was qualified for an accommodation."  (Nichols Dep. Ex. J. at ¶ 12; Nichols Dep. at Tr. 56–57.)  If Nichols determined, based on AstraZeneca's legal team "that also reviewed every religious request individually," that more information may be necessary to decide whether an individual was qualified for a religious accommodation, HR would send "follow-up questions to the employee" based on the information they provided in the Request Form. (Nichols Dep. Ex. J. at ¶ 8; Nichols Dep. at Tr. 59.)  Nichols

7

reviewed every religious accommodation request individually, and nobody on his team took any notes during this process.  (Nichols Dep. at Tr. 21, 149, 183.)[3]

As of October 2023, in total, AstraZeneca received 800 accommodation requests concerning the vaccine mandate, 666 of which were religious requests.  (Nichols Dep. Ex. J. at ¶ 17; Nichols Decl. (Doc. No. 36-9) at ¶¶ 6–9.)[4]  AstraZeneca approved 445 of these 666 religious accommodation requests and 56.72% of the 134 medical requests it received, resulting in a religious request approval rate of 66.82% and an overall accommodation approval rate of 65.1%.  (Nichols Dep. Ex. J. at ¶ 17; Nichols Decl. at ¶¶ 6–9.)

### B.    Bobnar's Employment with AstraZeneca

Bobnar began employment with AstraZeneca as a Diabetes Sales Specialist in February 2014.  (Bobnar Dep. at Tr. 167–68.)  Bobnar was promoted to Respiratory Specialty Representative in November 2017, and then to Biologics Sales Specialist in May 2021.  (*Id.*; Bobnar Dep. Ex. 25 at PageID# 1545.)

Shortly after Bobnar became a Biologics Sales Specialist, Bobnar began to report to District Sales Manager Joshua Wood ("Wood").  (Bobnar Dep. at Tr. 170; Wood Dep. at Tr. 19.)  At the time, Andrea Criddle ("Criddle") was a People Services Lead with AstraZeneca's HR department.  (Criddle Dep. at Tr. 8.)  Bobnar's job was to market specialty AstraZeneca products in the "Cleveland West"

---

[3] A copy of a Declaration from Nichols in *Wilhoit v. AstraZeneca Pharmaceuticals, LP*, Case No. 22-cv-1634-GBW (D. Del. Oct. 30, 2023) (ECF No. 48) is included as Exhibit J to Nichols' deposition transcript.  (Nichols Dep. Ex. J at PageID# 569–75.)

[4] A copy of Nichols' Declaration is attached to AstraZeneca's Motion for Summary Judgment.  (Doc. No. 36-9.)  In its Motion for Summary Judgment, AstraZeneca cites Nichols' Declaration as an "Affidavit," even though the document is a Declaration.  (Doc. No. 36-2 at PageID# 784.)

territory, which covered 40 to 50 office locations for 80 to 100 key customers, mainly healthcare providers.  (Bobnar Dep. at Tr. 163, 173–74.)

As a Biologics Sales Specialist, Bobnar hosted speaker programs where a specialist "would come in and talk about the disease state" or the AstraZeneca product specifically.  (*Id.* at Tr. 180; Wood Dep. (Doc. No. 34-2) at Tr. 23–24.)  Bobnar's specialty focus was on pulmonary; allergy; ear, nose, and throat; pharmacy directors and all supporting staff.  (Bobnar Dep. at Tr. 175.)  Sixty percent of the healthcare providers Bobnar called upon were pulmonologists, and most of the remaining forty percent were allergists.  (*Id.* at Tr. 199.)  Bobnar's specialty product was Fasenra, which was used to treat patients with severe asthma.  (*Id.* at Tr. 174.)  Bobnar, as an AstraZeneca "representative" and "ambassador of the AstraZeneca brand," described himself as "on the front lines" while marketing AstraZeneca products to pulmonologists who were "on the front line of treating COVID patients." (*Id.* at Tr. 183–84, 186.)  These pulmonologists were "too exhausted to attend" speaker programs and "didn't want to come to a dinner program and expose other physicians."  (*Id.* at Tr. 184.)

Bobnar would meet with providers in their offices, lunchrooms, cafeterias, and sometimes the hallway in between patients, though he would never have to interact with them in the presence of a patient.  (*Id.* at Tr. 177.)  Bobnar preferred to have in-person meetings with providers as opposed to meeting them virtually, as doing so was "easier" and "always [] better."  (*Id.* at Tr. 175–76, 182.). Thus, since becoming a Biologic Sales Specialist, 95% of Bobnar's work had involved "face-to-face" visits with customers.  (*Id.* at Tr. 172; Wood Dep. at Tr. 21–22.)  Throughout the time Bobnar conducted in-person visits, he was not aware of any providers in his territory having a policy requiring sales representatives to "be vaccinated to visit them in person."  (Bobnar Dep. at Tr. 192–93.)

Beyond visiting customers, however, biologic sales specialists such as Bobnar would fill out expense reports, speak with physicians, and enter data.  (*Id.* at Tr. 18–19.)  This work was largely capable of being done remotely.  (*Id.* at Tr. 19.)

Prior to AstraZeneca's mandate, Bobnar and other unvaccinated AstraZeneca employees underwent weekly COVID-19 PCR testing.  (Criddle Dep. at Tr. 24; Wood. Dep. at Tr. 30; Bobnar Dep. at Tr. 195.)  At some point in 2021, Bobnar tested positive for COVID-19.  (Bobnar Dep. at Tr. 198.)  In the week before he tested positive, Bobnar had interacted in-person with providers.  (*Id.*)[5]

### C.    Bobnar Applies for a Religious Accommodation

In a series of texts on February 25, 2022, Bobnar texted Wood that he was having an attorney look at his accommodation request.  (Wood. Dep. at Tr. 50; Wood Dep. Ex. D at PageID# 624.)  Bobnar expressed via text his sentiment that "the level of harassment [AstraZeneca is] going to is beyond words" and that "AstraZeneca has clearly picked what they are willing to discriminate against."  (Wood Dep. Ex. D at PageID# 626.)

In a Declaration, Bobnar asserts that his texts messages to Wood constituted a complaint about discrimination and harassment.  (Bobnar Decl. (Doc. No. 37-1) at ¶ 1.)[6]  Wood did not tell HR, including Nichols, about what Bobnar had texted him.  (Wood Dep. at Tr. 73.)  Nichols also never

---

[5] In its Motion for Summary Judgment, AstraZeneca represents that Bobnar said he was "sure" he got COVID from a "customer's office."  (Doc. No. 36-1 at PageID# 762.)  However, the quoted passage of the transcript does not stand for this, and by the Court's search, Bobnar did not say he was "sure" of the source of COVID in his deposition.  In a letter Bobnar allegedly sent to AstraZeneca on April 27, 2022 (discussed below), Bobnar did indicate that he contracted COVID "[a]s a result" of his visits to a pulmonary office wherein healthcare providers would walk over from a COVID ICU "and shake my hand and sit down to eat with me."  (Bobnar Decl. Ex. A-1 at PageID# 933.)

[6] A copy of Bobnar's Declaration is attached to Bobnar's Opposition to AstraZeneca's Motion for Summary Judgment. (Doc. No. 37-1.)

discussed with Wood or spoke with him about Bobnar's texts before making a decision on Bobnar's request, and Wood was never asked for input.  (Nichols Dep. at Tr. 79; Wood Dep. at Tr. 60–61.)

On February 28, 2022, Bobnar emailed his Religious Exemption Form ("Bobnar's Request") to AstraZeneca.[7]  (Bobnar Dep. Ex. 25 at PageID# 1544; Bobnar Dep. at Tr. 229–30.)  In Bobnar's Request, he explained that he objected to AstraZeneca's COVID-19 vaccination mandate as follows: "I choose to exercise my right, which is protected by the Civil Rights Act of 1964-Title VII, to demand a religious exemption to the requirement that I receive a COVID- 19 vaccine. This demand for an exemption is based on my deeply held religious beliefs pursuant to my reliance on teachings by the Holy Spirit and the Holy Bible."  (*Id.* at PageID# 1545, 1547.)

Bobnar described the basis of his sincerely held religious belief as follows:

> The Bible says, "Therefore, to him that knows to do good, and does not do it, to him it is sin" (James 4:17, NKJV). My personal convictions are inspired by my study and understanding of the Bible, and personally directed by the true and living God. I am personally convicted, through prayer and meditation, by the Holy Spirit that I should not receive any of the COVID-19 vaccines. I believe that I am required to search the Scripture myself for related truths. Romans 15:4 says "For everything that was written in the past was written to teach us". [*sic*] I also believe that I am called to seek personal guidance from the Holy Spirit (Acts 2:38-39; Romans 8). The Holy Spirit has guided me not to take any of the vaccines for Covid-19. I also believe that God is the author and sustainer of life. Altering life as he has created it is sinful.

(*Id.* at PageID# 1547.)  Bobnar discussed the length of time that he has held his religious belief:

> I am non-denominational born again follower of Jesus Christ and since a very young age I have always believed what the Bible says. Job 33:4: states: "The Spirit of God has made me; the breath of the Almighty gives me life." I also believe what David wrote in the book of Psalms. Psalm 139:13-14 states "for it was You who created my inward parts; you knit me together in my mother's womb. I will praise You because I have been fearfully and wonderfully made". [*sic*] God has uniquely made me with great reverence and I am set apart for His glory.

---

[7] Bobnar attached an additional statement to his email because the PDF form "would not allow [him] to expand properly to accommodate [his] answers."  (Bobnar Dep. Ex. 25 at PageID# 1544.)

(*Id.*)    Bobnar further indicated that he "attended Christian schooling as well as a Christian University for my undergrad. Throughout those years to the present I have attended church regularly as well as been an active member leading small group, Bible studies and mentoring high school students. My beliefs and lifestyle impact every area of my life as I am lead by the Spirit and honor God with my body, time, and resources." (*Id.*)

> Bobnar explained how his religious beliefs affect other areas of his life as follows:
>
> 1 Corinthians 6:19-20 says, " ... Your body is a temple of the Holy Spirit within you, whom you have from God. You are not your own, for you were bought with a price. So glorify God in your body." I am solely responsible to God for my body—how I treat it, how I use it, how I take care of it, and what I put into it. My body is considered a "sacred temple" that is devoted to God for sacred purposes. I am called to honor God with my mind, body, and heart. After prayerful conviction and scriptural meditation, the Spirit of God has told me not to take any of the COVID vaccines, therefore it would be dishonoring and sinful to God for me to put something into my body for which I had a conscientious objection. Therefore, on religious ground I would be violating a sacred trust to honor God with my body if I were to allow the COVID vaccine to be injected into my body. I believe that Satan tempts us and God uniquely gives us convictions and tests our hearts throughout different scenarios in our lives. Deuteronomy 8:2 states: "that He might humble you, testing you to know what was in your heart, whether you would keep His commandments or not". God has given me this conviction and I am following his commandment to me as I am led by the Holy Spirit.

(*Id.*)  Lastly, Bobnar indicated that he had never made a religious accommodation request before and, as supporting documentation, provided links to the website of Christ Community Chapel and quoted twenty-five passages from the Bible.[8]  (*Id.* at PageID# 1546, 1548–49.)

### D.    AstraZeneca Requests Follow-Up Information

On March 17, 2022, AstraZeneca's HR team sent Bobnar an email informing him that AstraZeneca had evaluated his Request and, through Nichols' review, determined that additional

---

[8] The twenty-five passages are fully set forth in Bobnar's Request and are incorporated by reference as though fully rewritten herein.  (Bobnar Dep. Ex. 25 at PageID# 1548–49.)

12

information was necessary.  (Bobnar Dep. Ex. 27; Nichols Dep. at Tr. 56.)  In particular, AstraZeneca

requested that Bobnar provide additional information responsive to the following prompt:

> Your request mentions that you cannot get vaccinated because of your beliefs that your
> body is a temple and that you are prohibited from putting harmful substances into your
> body. To help us understand your religious beliefs better, can you confirm whether,
> for the period while you have held these religious beliefs, you have smoked cigarettes,
> consumed alcohol, received any tattoos or used any legal recreational drugs? If yes,
> please describe why these activities do not violate your religious belief that your body
> should not be subjected to anything that may harm it.

(Bobnar Dep. Ex. 27 at PageID# 1554.)

According to Nichols, AstraZeneca sent the request to give Bobnar an opportunity to "add

more context" so that AstraZeneca could "understand more deeply the actual religious tenets and

beliefs that were preventing [Bobnar from] getting the COVID-19 vaccine, understand more the life

and lifestyle preventing vaccination." (Nichols Dep. at Tr. 47–48, 61, 63.)  Nichols testified that this

follow-up was "specifically tailored" as a question that "aimed to get more additional [sic]

information and context." (*Id.* at Tr. 63.)  Nichols further explained that Bobnar never said, and

Bobnar's response did not indicate, that the Holy Spirit told him to not take the COVID vaccine

because it was harmful. (*Id.* at Tr. 47, 62.)[9]

On March 23, 2022, Bobnar sent AstraZeneca the following response:

> As I mentioned in my original statement, God has told us that our bodies are to glorify
> him and are a temple for His Spirit. As I mentioned:
>
> 1.      I have been convicted by the Holy Spirit to not receive any of the covid
> vaccines.
> 2.      I am responsible to honor God with my body and all of my life choices.

---

[9] In his Motion for Partial Summary Judgment, Bobnar contends that Nichols testified that, "when necessary, [Nichols sent] an employee 'tailored follow-up questions.'"  (Doc. No. 33-1 at PageID# 301.)  However, the quoted passage does not support the proposition that Nichols sent tailored follow-ups "when necessary."  (Nichols Dep. at Tr. 115.)

> As a result, as a follower of Jesus Christ led by the Spirit there are many things I abstain from in my life including but not limited to the ones mentioned in the question above. I abstain from putting things in or on my body that I have been told not to either from scripture or by conviction of the Holy Spirit. Gods view of "harmful substances" looks different for believers as it does for those who do not believe.

(Nichols Dep. Ex. B. at PageID# 533.)  Bobnar also provided three passages from Scripture relating to "sexual immorality," "orgies and drunkenness," "quarreling and jealousy," and passing judgment.[10]  (*Id.* at PageID# 533–34.)

### E.      Bobnar's Request is Denied

On March 31, 2022, AstraZeneca denied Bobnar's accommodation request, explaining in an email that Bobnar was "not qualified for a reasonable accommodation." (Bobnar Dep. Ex. 28; Bobnar Dep. at Tr. 249.)  AstraZeneca's email also explained that, where the request poses undue hardship, including "business disruption/increased costs resulting from illness-related absences," AstraZeneca is entitled to deny accommodation requests.  (Bobnar Dep. Ex. 28 at PageID# 1556.)  The email further informed Bobnar that AstraZeneca "expect[ed] that [Bobnar] will come into compliance with [its] mandate."  (*Id.*)  Specifically, AstraZeneca informed Bobnar that he had to become fully vaccinated and receive at least one dose of a vaccine by April 22, 2022. (*Id.* at PageID# 1557; Nichols Dep. at Tr. 85–86.)  AstraZeneca informed Bobnar that if he chose not to get vaccinated he could remain an active employee with AstraZeneca until April 29, 2022, at which point his employment would be "terminated without severance."  (Bobnar Dep. Ex. 28 at PageID# 1557.)

According to Nichols, the email was drafted by AstraZeneca's HR and legal teams and was the same template email used for other employees who sought a religious accommodation but were

---

[10] In particular, Bobnar quoted 1 Thessalonians 4:3–8, Romans 13:13, and Romans 14:1–7.  (Nichols Dep. Ex. B at PageID# 533–34.)

denied.  (Nichols Dep. at Tr. 71.)  Nichols and his HR team did not vote, seek a consensus, or consult

Bobnar before AstraZeneca made its decision.  (*Id.* at Tr. 73–74.)  In evaluating Bobnar's request,

Nichols read the original request, conferred with counsel as needed, and determined if he had enough

information to make a decision or if he needed additional information to determine whether Bobnar

was qualified for an accommodation.  (*Id.* at Tr. 56–58; Nichols Dep. Ex. J. at PageID# 570–71.)

In denying Bobnar's Request, Nichols considered the information Bobnar provided.[11]

(Nichols Dep. at Tr. 190–91.)  Nichols and his team, as part of the accommodation request review

process, did not "doubt the sincerity of [Bobnar's] answers."  (*Id.* at Tr. 100.)  Nichols also

acknowledged that "religion can mean different things to different people" and that "millions of

Christians" believe in Jesus Christ and that Jesus "sent the Holy Spirit in [H]is place" when he

ascended to Heaven.  (*Id.* at Tr. 41, 102–03.)  According to Nichols, the responses Bobnar provided

when asked for additional information did not give Nichols reason to believe that Bobnar sought an

accommodation for anything other than religious reasons.  (*Id.* at Tr. 65–66.)  Indeed, Nichols thought

that nothing in Bobnar's Request included a non-religious basis for the accommodation or indicated

that he expressed a concern about the efficacy of the COVID vaccine, had any political motivations

for refusing the vaccine, opposed the vaccine because it was unfair to be forced to do something

involuntary, had non-religious objections based on philosophy or sociological concerns, or felt the

vaccine contained harmful substances.  (*Id.* at Tr. 29, 45–47.)  Instead, Nichols thought that "what

did not come across" as to whether Bobnar had a "sincerely held religious belief that met the level of

---

[11] In his Motion for Partial Summary Judgment, Bobnar represents that Nichols testified that considered "only this information Bobnar provided," but the quoted passage does not indicate that Nichols considered "only" the information that Bobnar provided.  (Doc. No. 33-1 at PageID# 303; Nichols Dep. at Tr. 190–91.)

receiving an exemption" was "what specific religious tenets or beliefs were being referenced." (*Id.* at Tr. 99–100.)

According to Nichols, Bobnar's Request provided "a number of statements, a number of references, a number of bible verses" without "tying to the sincerity, the closeness, the tenet of that religious belief that actually specifically prevented vaccination" and therefore "did not translate into an actual religious belief or tenet that actually prevented vaccination against COVID." (*Id.* at Tr. 61, 66, 81–82, 100.) While Bobnar's Request discussed how his body is a temple, Nichols believed that Bobnar did not "specifically go into anything that describes how his body is a temple, the tie-ins to a tenet or a specific religious belief, or how it's demonstrated in other ways throughout his life." (*Id.* at Tr. 61.) Thus, according to AstraZeneca, Bobnar had not demonstrated a "specific connection to an actual tenet or belief that . . . really prevented vaccination." (*Id.* at Tr. 39, 61, 66, 81–82.)

Wood, despite not having any input into the denial of Bobnar's Request, also never doubted Bobnar's sincerity about his request for a religious accommodation. (Wood Dep. at Tr. 54, 60–61.) Indeed, Wood supported Bobnar's religious accommodation request "100%." (*Id.* at Tr. 72; Wood Dep. Ex. D PageID# 626)

On April 7, 2022, Bobnar asked HR several questions, including whether the denial of his religious accommodation was reviewable, to which HR responded that the decision was "final." (Bobnar Decl. at ¶ 2; Nichols Dep. Ex. C at PageID# 535.)

On April 27, 2022, Bobnar sent a letter ("April 27 letter") to AstraZeneca's management, claiming that the process of denying his accommodation request was discrimination. (Bobnar Decl. at ¶ 3.) In his letter, Bobnar wrote that he believed that AstraZeneca's approval of some of his colleagues' exemption requests but not his own was "nothing less than discriminatory." (Bobnar

16

Decl. Ex. A-1 at PageID# 933.)  Bobnar also wrote that he believed he was treated as a criminal or a disgruntled employee for "having faith, convictions and not to mention natural immunity/high antibodies for a virus."  (*Id.* (emphasis in original).)

According to AstraZeneca, because Bobnar failed to demonstrate that he had sincerely held religious beliefs that conflicted with AstraZeneca's COVID-19 vaccination requirement, Bobnar could not continue his employment with just continuing to undergo weekly COVID tests.  (Nichols Dep. Ex. D at PageID# 542; Nichols Dep. 98–99.)  Nevertheless, Bobnar refused to get the vaccine. (Bobnar Dep. at Tr. 277.)

Criddle and Wood were unaware of any of Bobnar's customers having complained that Bobnar was unvaccinated.  (Criddle Dep. at Tr. 28; Wood Dep. at Tr. 28.)  And Nichols was unaware of AstraZeneca tracking the infection rate of AstraZeneca employees who contracted COVID and whether unvaccinated employees contracted COVID-19 at a higher rate than the vaccinated population.  (Nichols Dep. at Tr. 180.)  Wood "did not know" of any lost sales due to his or Bobnar's vaccination status.  (Wood Dep. at Tr. 35–36.)

On April 29, 2022, Bobnar was terminated from his position with AstraZeneca.  (Doc. No. 36-3 at PageID# 791.)

### F.    Wood Applies for a Religious Accommodation

Wood, as Bobnar's manager and District Sales Manager, served the same customers (hospitals, medical practices, physicians, etc.) that Bobnar served, and, as a field employee, did not have to report to an AstraZeneca office.  (Wood Dep. at Tr. 14, 68–69.)  At all relevant times, Wood was unvaccinated and participated in weekly COVID PCR testing.  (*Id.* at Tr. 35–36.)

17

On February 28, 2022, Wood sent AstraZeneca his religious accommodation request form ("Wood's Request").  (Wood. Dep. at Tr. 36–37; Wood Dep. Ex. C.)  Like Bobnar, Wood attached explanations for his responses and Bible verses in support thereof, and indicated that he had not previously requested a religious accommodation.  (Wood Dep. Ex. C at PageID# 617–18.)

In Wood's Request, Wood described the nature of his objection as "the [B]ible teaches us to trust in the [L]ord to take care of us and heal us. It also teaches us that our body is a temple and should be treated thusly."  (*Id.* at PageID# 617.)  Wood also provided a Bible verse in support of this description.  (*Id.*)  Wood also represented the basis for his religious belief as follows, quoting the same verse from 1 Corinthians 6:19–20 as Bobnar did, relating to his body being a temple of the Holy Spirit: "I have always lived under the above [B]ible verse with the belief that 'my body is a temple.' This is, and always has been, one of my main focuses for my entire life. I use medication only when it is to treat a current malady, disease, or condition that I have, because of this belief."  (*Id.*)[12]

Wood explained that he has "held this belief since I was a child and then when I came of age and was allowed to make these decisions on my own. I grew up in a church that followed Christianity throughout my childhood, and became nondenominational during high school. However, the entire time I chose to live my life by the teachings and tenants of the Holy Bible."  (*Id.*)

Wood lastly explained how his religious belief prevents him from receiving the COVID vaccine by reiterating the explanation of the basis for his religious belief.  (*Id.*)  Wood also provided additional information, as follows:

> I am 48 years old.
> I do not drink (as friends, colleagues, and my supervisor will attest).
> I do not smoke.

---

[12] Bobnar and Wood appear to quote different translations of the Corinthians verse.  (Bobnar Dep. Ex. 25 at PageID# 1547; Wood Dep. Ex. C at PageID# 617.)

> I have no tatoos [*sic*] or piercings.
> Have never tried any recreational drugs.
> I exercise 6 days a week.
> I am on no chronic prescription medicines.
> I have no comorbidities.
> I haven't received any vaccinations (including flu shots) since I was a child.
>
> As an aside, I had Covid 19 during thanksgiving of 2021. I have two AstraZeneca approved tests to prove that I did. When I got it, it was a minor, 3 day cold. I experienced some fatigue, sinus symptoms, and a slight headache. These vaccines function in keeping patients from being hospitalized and keeping patients from dying.
>
> So, I ask, why am I being forced to go against everything I believe and practice, to take a medicine that will help prevent me from being hospitalized and dying when the virus itself (Covid 19) caused me nothing but mild symptoms?"

(*Id.* at PageID# 618.)

On March 31, 2022, AstraZeneca granted Wood's Request.  (Nichols Dep. at Tr. 143.) Nichols testified that there was not a formula or certain words an employee requesting an exemption would need to include to guarantee an exemption.  (*Id.* at Tr. 159.)  According to Nichols, Wood's Request was granted because he described his religious beliefs, the tenets of his religious belief, and then went into "quite a bit of detail" about how that belief factors into his lifestyle and offers "a number of things for why [] not getting the COVID-19 vaccine is consistent" with his belief and lifestyle."  (*Id.* at Tr. 162–63.)  Nichols felt that, relative to Bobnar's Request, Wood's Request went "into much more detail and much more context of how [his] life is lived and how that aligns with the religious beliefs that [he] describe[s]."  (*Id.* at Tr. 159–60.)  According to Nichols, Wood's itemized statements that he does not drink, smoke, use recreational drugs, have tattoos or piercings, or use chronic prescription medicines, and has not received vaccinations since he was a childhood lent credibility to his accommodation claim and "demonstrates a repeated lifestyle of how not getting the COVID-19 vaccine is consistent with their lifestyle and the religious beliefs that they describe in this

19

document." (*Id.* at Tr. 161.)  Following AstraZeneca's approval of Wood's Request, Wood's day-to-day job duties did not change.  (Wood. Dep. at Tr. 59.)

The email that AstraZeneca sent to employees who received an accommodation was based on a template email and was sent at 1:40 P.M. on March 31, 2022.  (Nichols Dep. at Tr. 129; Nichols Dep. Ex. G.)  This email informed employees that the approval was "based on a review of all information shared during the interactive process and on your representation that you are unable to be vaccinated against COVID-19."  (Nichols Dep. Ex. G PageID# 560–61.)  Further, AstraZeneca would allow them to work without being vaccinated if they "follow local guidance from your site on any masking requirements" and "get tested at least once a week for COVID-19 using an approved PCR test." (*Id.* at PageID# 387.)

On May 25, 2022, AstraZeneca eliminated the PCR testing requirement for field employees, including biologics sales specialists, and transitioned to at-home antigen testing for exempted employees.  (Wood Dep. at Tr. 68–69; Wood Dep. Ex. H at PageID# 632; Criddle Dep. at Tr. 70–71.)  According to AstraZeneca's May 25 notice, antigen testing was "easier and more convenient for employees."  (Wood. Dep. Ex. H at PageID# 632.)  The notice further provided that field employees with a qualified exemption from the Mandate would be supplied with antigen tests for at-home administration.  (*Id.* at PageID# 632.)  On January 5, 2023, AstraZeneca notified its employees that employees exempted from vaccination would no longer be required to track their COVID testing. (*Id.* Ex. I at PageID# 634.)

### G.     Bobnar's Paternity Leave

At some point before March 14, 2022, Bobnar applied for leave under the Family Medical Leave Act ("FMLA").[13] (Bobnar Dep. Ex. 31.) Bobnar intended to take FMLA leave before his accommodation was denied, but he could not recall whether he intended to take leave after AstraZeneca notified him of the COVID-19 vaccination mandate. (Bobnar Dep. at Tr. 265.)

On April 21, 2022, after AstraZeneca's March 31, 2022 denial of Bobnar's accommodation request, MetLife Disability approved his Child Bonding request under the FMLA for a period beginning April 13, 2022 and ending on June 7, 2022. (Bobnar Dep. Ex. 32 at Page ID# 1581.)

During Bobnar's FMLA leave, Bobnar's computer was shut off, which led to Bobnar having a "hard time producing some documentation for this specific case" because he "lost access to the server" and could not log in. (Bobnar Dep. at Tr. 266.) Wood contacted Bobnar to discuss various off-boarding procedures, such as his termination and documentation relating thereto (such as final expenses submission), returning Bobnar's company car, clearing his computer and iPad of company information, shipping all items to AstraZeneca, and cutting up the company credit card. (*Id.* at Tr. 266–67, 269; Bobnar Decl. at ¶¶ 7–8.) Bobnar was asked to meet Wood at a coffee shop to give him half of the company credit card to verify that Bobnar indeed cut it up and would not continue using it. (Bobnar Dep. at Tr. 266–67; Bobnar Decl. at ¶ 7.) Bobnar also spoke with AstraZeneca employee Tami Elwell ("Elwell") over the phone while he was on leave. (*Id.* at Tr. 270.) Bobnar communicated with AstraZeneca employees for approximately 10 hours during his leave, about half of which was communication with Wood about off-boarding. (*Id.* at Tr. 271, 273.)

---

[13] In his deposition, Bobnar testified that he did not have an exact date as to when applied for FMLA leave, and AstraZeneca did not provide a copy of Bobnar's initial FMLA request or application. (Bobnar Dep. at Tr. 262.)

Bobnar had various appointments scheduled during his leave, such as lunch appointments, coffee appointments, calls, and speaker programs. (*Id.* at Tr. 267–68.) Bobnar asserts in his Declaration that he received multiple calls from coworkers and customers regarding "normal sales activities" and was required to transfer multiple customer lunch and coffee appointments and office and contact information to a coworker. (Bobnar Decl.[14] at ¶ 6.) Bobnar testified that some of these conversations with AstraZeneca employees, including Heath Green (or Heath Saltis) ("Heath"), Casey Morrison, and Elwell, regarded coordinating efforts as to the speaker and lunch programs, as well as other "strategic stuff that was happening." (Bobnar Dep. at Tr. 273–74.) In his Declaration, Bobnar asserts that these tasks included "discussing with a co-worker specific marketing and sales initiatives for certain customers." (Bobnar Decl. at ¶¶ 6, 8.) Bobnar further testified that, although some customers also reached out to Bobnar during his leave, Bobnar did not attend any meetings. (Bobnar Dep. at Tr. 267–68.) And according to Bobnar, every one of his team members called him

---

[14] AstraZeneca contends that the Court cannot consider Bobnar's Declaration because it is "contradictory" to and an attempt to "revise" his deposition testimony. (Doc. No. 41 at PageID# 1145–47.) The Sixth Circuit has repeatedly indicated that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). In determining an affidavit's admissibility at summary judgment, courts must first consider "whether the affidavit 'directly contradicts the nonmoving party's prior sworn testimony,'" and, "[i]f so, absent a persuasive justification for the contradiction, the court should not consider the affidavit." *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) (citation omitted). Sixth Circuit precedent suggests "a relatively narrow definition of contradiction." *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006). If a party "was not directly questioned about an issue," a later affidavit on that issue simply "fills a gap left open by the moving party." *Aerel, S. R. L v. PCC Airfoils, LLC*, 448 F.3d 899, 907 (6th Cir. 2006). In his Declaration, Bobnar averred that he was "required" to transfer appointments and contact information to a coworker. (Bobnar Decl. at ¶ 6.) AstraZeneca contends that this averment contradicts his deposition testimony that his computer was shut off while he was on leave and nobody required him to have those discussions. (Doc. No. 41 at PageID# 1146 (quoting Bobnar Decl. ¶ 6).) Although Bobnar, during his deposition, also testified that his coworkers had access to his virtual calendar and that he had conversations with them about his lunch and coffee appointments, he expressly noted that no one required him to have those conversations, he could have not answered those calls, and he could have had those conversations before he went on leave. (Bobnar Dep. at Tr. 267–75.) The Court will thus consider Bobnar's averment that his co-workers had access to his calendar and partook in conversations with him as it relates to Bobnar's FMLA claims. However, the Court will not consider Bobnar's averment in his Declaration that he was "required" to have any conversations because it contradicts his deposition testimony, and, as discussed below, it is conclusory.

following a conference call in which Wood announced that Bobnar would be terminated, though Bobnar admitted that he could have declined to participate in the conference call.  (*Id.* at Tr. 271–72.) Bobnar did not consider his team members' calls to be harassment.  (*Id.* at Tr. 272.)

Bobnar considers communications concerning his appointments, speaker programs, and business accounts as harassment.  (*Id.*)  In particular, Bobnar considers Elwell and Heath's calls concerning coordination as to speakers, his lunch calendars, and key accounts to be harassment.  (*Id.* at Tr. 274–75.)  Nobody, including Wood, told Bobnar that he needed to have these conversations, and Bobnar could have had them before he went out on leave.  (*Id.* at Tr. 275.)

**H.  AstraZeneca's Field Sales Incentive Program**

During his employment with AstraZeneca, Bobnar was eligible to receive field sales incentive compensation pursuant to AstraZeneca's Field Sales Incentive Plan ("FSIP").[15]  (Nichols Decl. Ex. 1 at PageID# 1108 ("[A]ll Employees are eligible to participate in the Plan.").)  The FSIP governed Bobnar's bonus eligibility.  (Bobnar Dep. at Tr. 278–79.)  Under the FSIP, AstraZeneca is to "provide awards to eligible employees who, individually or as members of a group, contribute to the success of AstraZeneca and its Affiliates."  (Nichols Decl. Ex. 1 at PageID# 1104.)

Under the terms of the FSIP, the first quarter's payment would be awarded by June 30 of the plan year, with the condition that the Q1 payment would not be made "to a Participant who is not an employee on the last working day of [Q1] unless otherwise outlined within this Plan."  (*Id.* at PageID# 1106, 1111.)

In subparagraph VII(l), the FSIP further provides:

"Termination for Cause (Discharge). An Employee who incurs a Separation from Employment for Cause (whether during or after the Plan Year) shall not be eligible to

---

[15] A copy of the FSIP is attached as Exhibit 1 to Nichols' Declaration.  (Doc. No. 36-9.)

receive any award not paid out prior to the time of such Separation from Employment, regardless of whether or not such award has been determined or is determinable."

(*Id.* at PageID# 1115.)  The FSIP defines "Cause" as an "Employee's dishonesty, insubordination, gross mismanagement, deliberate and premeditated acts against the interests of the Company, gross and repeated violation of the Company's policies, procedures, or recognized standard of behavior, misconduct related to the Employee's employment, or commission of a felony, as determined in each case in the sole discretion of the Company."  (*Id.* at PageID# 1104.)

According to Bobnar, under his compensation package, he was scheduled to receive a $38,000 bonus in 2022, including a Q1 bonus of $9,500.  (Bobnar Dep. at Tr. 278.)  The FSIP defined "First Quarter" as "the three-month period beginning on January 1 and ending on March 31 of a Plan Year," or the "fiscal year of the Company or any other period designated by the Board."  (Nichols Decl. Ex. 1 at PageID# 1105–06.)  Because Bobnar worked through the end of March 2022, Q1 2022 would have been his last bonus period.  (Wood Dep. at Tr. 75.)  The payout date for Q1 bonuses tended to be a "quarter behind," so Bobnar would have been paid for the Q1 bonus on or about June 30, 2022. (Bobnar Dep. at Tr. 280; Wood Dep. at Tr. 75.)  Bobnar's employment with AstraZeneca ended on April 29, 2022, before AstraZeneca's payout of the Q1 bonuses.  (Bobnar Dep. at Tr. 280–81.)

Bobnar asked Wood if he would receive the Q1 bonus under the FSIP.  (Bobnar Decl. at ¶ 4.) According to Bobnar, Wood told him that he would receive the bonus only if he resigned and signed a full release of liability against AstraZeneca.  (*Id.* at ¶ 4.)  Bobnar did not resign and refused to sign a liability release, believing he did nothing wrong and that a release would not be fair.  (*Id.* at ¶ 5.)

## II.    Procedural History

On December 15, 2022, Bobnar filed a Complaint alleging six Counts against AstraZeneca: Religious Discrimination/Failure to Accommodate in Violation of O.R.C. Chapter 4112 and Title VII

24

(Count One); Religious Discrimination/Retaliation in Violation of O.R.C. Chapter 4112 and Title VII (Count Two); Violations of the Americans with Disabilities Act ("ADA") (Count Three); Family and Medical Leave Act Interference (Count Four); and Breach of Contract and/or Failure to Pay Wages in Violation of O.R.C. 4113.15 (Counts Five and Six).  (Doc. No. 1 at ¶¶ 51–92.)

On February 24, 2023, AstraZeneca filed a Motion for Partial Dismissal of Plaintiff's Complaint, in which it sought to dismiss Bobnar's ADA claim (Count Three).  (Doc. No. 11.)  On May 9, 2023, the Court issued a Memorandum Opinion and Order granting AstraZeneca's Motion for Partial Dismissal and dismissed Bobnar's ADA claim (Count Three).  (Doc. No. 24.)  Bobnar's five other Counts (Counts One, Two, Four, Five, and Six) remain pending.

On May 1, 2024, Bobnar filed his Motion for Partial Summary Judgment (Doc. No. 33), in which he seeks summary judgment as to his claims in Count One and Counts Five and Six.  (Doc. No. 33.)  AstraZeneca filed an Opposition to Bobnar's Motion on May 31, 2024 (Doc. No. 39).  Bobnar filed a Reply in support of his Motion on June 6, 2024.  (Doc. No. 40.)

On May 6, 2024, AstraZeneca filed its Motion for Summary Judgment as to all of Bobnar's remaining claims (Doc. No. 36), to which Bobnar filed an Opposition on May 21, 2024 (Doc. No. 37).  AstraZeneca filed a Reply in support of its Motion on June 11, 2024.  (Doc. No. 41.)[16]

---

[16] On May 3, 2024, before filing its Motion for Summary Judgment, AstraZeneca requested leave to exceed the 20-page limit for filing initial memoranda and to file a 30-page motion for summary judgment.  (Doc. No. 35.)  The Court granted AstraZeneca leave to file a 25-page such motion.  (Non-Document Order, May 3, 2024.)  However, there is something peculiar about AstraZeneca's Brief in Support of its Motion for Summary Judgment ("Brief in Support"), as well as its Opposition to Bobnar's Motion for Partial Summary Judgment ("Opposition").  (See Doc. Nos. 36-1, 39.)  AstraZeneca formatted the text so that the letters are closer together, decreasing the amount of space each individual word occupies. Compare AstraZeneca's Brief in Support (Doc. No. 36-1) and, for example, AstraZeneca's cover page to its Motion (Doc. No. 36).  It appears that AstraZeneca formatted the text in its Brief in Support (as well as its Opposition) to circumvent the page limits set by the Court.  In particular, AstraZeneca's Brief in Support just barely makes it under 25 pages (and the same goes for AstraZeneca's Opposition, which rounds out at 20), and aside from these two documents, most if not all of its remaining briefing uses appropriate formatting.  The Court cautions AstraZeneca to not employ these tactics again in any future filings.  The page length rules are established by the Local Rules. See Local Rule 7.1.  Circumventing these rules, and the Court's Order in relation thereto, is unfair to Bobnar, who had to abide by the Local Rules.

On June 19, 2024, Bobnar filed a Notice of Supplemental Authority in support of his Motion for Partial Summary Judgment, notifying the Court of the Sixth Circuit's decision in *Lucky v. Landmark Med. of Mich., P.C.*, 103 F.4th 1241 (6th Cir. 2024). (Doc. No. 42.) On June 27, 2024, AstraZeneca filed a Response to Bobnar's Notice of Supplemental Authority. (Doc. No. 43.)

Accordingly, Bobnar and AstraZeneca's Motions are ripe for a decision.

## III.   Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material . . . only if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc*., 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on

an issue for which it does not bear the burden of proof at trial, the moving party may [also] meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."  *Ask Chems.*, 593 F. App'x at 508–09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.  Analysis

### A.  Religious Discrimination/Failure to Accommodate in Violation of O.R.C. Chapter 4112 and Title VII (Count One)

In Count One of the Complaint, Bobnar alleges that AstraZeneca unlawfully failed to accommodate and discriminated against him when it denied his Request for a religious exemption from the Mandate, in violation of both Title VII of the Civil Rights Act of 1964 and Chapter 4112 of the Ohio Revised Code.  Bobnar and AstraZeneca each move for summary judgment on Bobnar's failure to accommodate claim.  (Doc. Nos. 33, 36.)

Under Title VII,[17] it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges

---

[17] Federal case law interpreting Title VII is generally applicable to Ohio's state law discrimination statute involving violations of Chapter 4112 of the Ohio Revised Code.  *Glenn v. Trumbull Cnty. Comm'rs*, 239 N.E.3d 1010, 2024-Ohio-1114, ¶ 85 (11th Dist.); *Plumbers & Steamfitters Joint Apprenticeship Cmte. v. Ohio Civ. Rights Comm'n*, 421 N.E.2d 128, 196 (Ohio 1981) ("[F]ederal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112."); *Isensee v. Amplity, Inc.*, 2024 WL 2132419, at *3 (S.D. Ohio May 13, 2024) (applying federal law to Chapter 4112 religious discrimination for failure to accommodate claim).  While only AstraZeneca expressly acknowledges Title VII case law's applicability to Chapter 4112 claims, Bobnar relies almost exclusively on

of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a).  Title VII defines

"religion" to include "all aspects of religious observance and practice, as well as belief, unless an

employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective

employee's religious observance or practice without undue hardship on the conduct of the employer's

business."  42 U.S.C. § 2000e(j).  "[F]ailing to accommodate the religious needs of an employee is []

a kind of religious discrimination."  *Savel v. MetroHealth Sys.*, 96 F.4th 932, 943 n.4 (6th Cir. 2024).[18]

In the Sixth Circuit, "[t]he heart of [a] failure-to-accommodate claim is that an employer discharges

(or otherwise discriminates against) an employee for failing a job-related requirement instead of

abiding by its 'statutory obligation to make reasonable accommodation for the religious observances'

of its employees."  *Id.* at 944 (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977)).

At summary judgment, a Title VII claim premised on a failure to provide a religious

accommodation requires a plaintiff first to establish a *prima facie* case of religious discrimination.

*Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007).  To establish a *prima facie* case of religious

discrimination, a plaintiff must show: "(1) that the employee holds a sincere religious belief that

conflicts with an employment requirement, (2) that the employee informed the employer about the

conflict, and (3) that the employee was discharged or disciplined for failing to comply with the

requirement."  *Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 355–56 (6th Cir. 2020).  If a

plaintiff establishes these elements, the burden shifts to the defendant to show that the

---

federal case law in his briefing on Count One.  Therefore, the Court will utilize federal case law interpreting Title VII for its analysis.

[18] A "religious accommodation" claim is a form of religious discrimination.  *Savel v. MetroHealth Sys.*, 96 F.4th 932, 943 n.4 (6th Cir. 2024); *see also Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) (referring to prima facie cases of religious discrimination and religious accommodation as requiring different elements).  According to the *Savel* court, the types of religious discrimination claims available under Title VII fall into either the disparate treatment and disparate impact categories, and failure-to-accommodate is a type of disparate treatment.  *Savel*, 96 F.4th at 943 n.4.

accommodation would create an "undue hardship." *Id.* (citing *Virts v. Consolidated Freightways Corp. of Del.*, 285 F.3d 508, 516 (6th Cir. 2002)); 42 U.S.C. § 2000e(j).

The parties dispute whether Bobnar has established a *prima facie* religious discrimination case, as well as whether AstraZeneca can demonstrate that accommodating Bobnar would have subjected it to an undue hardship. The Court will examine each prong, in turn, below.

### 1. *Prima Facie* Case: Sincerely Held Religious Beliefs

The Court begins with whether Bobnar has established a *prima facie* case of religious discrimination. AstraZeneca does not dispute that Bobnar's "convictions" or "beliefs" are sincerely held or that it implemented a mandatory COVID vaccine policy to which Bobnar objected. Of the three *prima facie* elements, therefore, AstraZeneca only disputes that Bobnar has failed to establish that he holds a religious belief that conflicted with AstraZeneca's Mandate. (Doc. No. 36-1 at PageID# 769; Doc. Nos. 39, 41.)

The determination as to what is a "religious" belief or practice is often a "difficult and delicate task." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981); *see also Frazee v. Ill. Dep't of Empy. Sec.*, 489 U.S. 829, 833 (1989) (recognizing the "difficulty of distinguishing between religious and secular convictions."). To ascertain whether an activity qualifies as the kind of religious belief meriting accommodation, courts "look to whether the beliefs professed by a [claimant] are . . . , in his own scheme of things, religious." *Welsh v. U.S.*, 398 U.S. 333, 339 (1970); *U.S. v. Seeger*, 380 U.S. 163, 185 (1960); *see also Jones v. First Ky. Nat'l Corp.*, 1986 WL 398289, at *3 (6th Cir. July 17, 1986); *E.E.O.C. v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684, 699 (M.D. Tenn. 2020). A plaintiff seeking to demonstrate that he possesses a religious belief that conflicts with an employment requirement must show that his practices are "rooted in religious principle" and not

29

"purely secular beliefs."  *DeVore v. Univ. of Ky. Bd. of Tr.*, 118 F.4th 839, 845 (6th Cir. 2024)

(internal quotation marks omitted).[19]

An "overlap between a religious and secular view does not place it outside the scope of Title

VII's religious protections, as long as the view is part of a comprehensive religious belief system."

*Sturgill v. American Red Cross*, 114 F.4th 803, 810 (6th Cir. 2024) (alteration and internal quotation

marks omitted) (quoting *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901 (8th Cir. 2024)).

In other words, a "coincidence of religious and secular claims in no way extinguishes the weight

appropriately accorded the religious one."  *Sturgill*, 114 F.4th at 810 (quoting *Callahan v. Woods*,

658 F.2d 679, 684 (9th Cir. 1981)).[20]  Further, "the same belief may be sincerely held by some as a

religious belief and . . . sincerely held by others as a simple matter of secular preference," and the

religious belief may be a secondary, "or even tertiary" reason for a party's convictions.  *Doswell v.

Smith*, 139 F.3d 888 (4th Cir. 1998) (table); *Cesare v. PACT MSO, LLC*, -- F. Supp. 3d -- , 2024 WL

2823193, at *6 (D. Conn. June 4, 2024).

Courts must bear in mind that religious beliefs protected by Title VII need not be "acceptable,

logical, consistent, or comprehensible" to others.  *Sturgill*, 114 F.4th at 809 (quoting *Thomas*, 450

U.S. at 714).  Accordingly, courts should not "question the veracity of one's religious beliefs."

---

[19] The Court relies on *Devore* strictly for purposes of establishing the rules surrounding Title VII analysis.  Although the
Sixth Circuit in *Devore* ultimately denied summary judgment, the facts of that case are readily distinguishable.  There,
the Sixth Circuit noted that aside from a conclusive statement that she objected to mandatory Covid testing "due to her
deeply religious beliefs," Devore offered "no other evidence to show a conflict between her religion and the Policy."
*Devore*, 118 F.4th at 847.  Devore "supplied no affidavit or declaration articulating how complying with the Policy
conflict[ed] with her religious beliefs or practices" and "entered none of her own deposition testimony in the record."  *Id.*
at 847–48.  In fact, throughout the entire litigation, Devore "never identified in the record what her religion is."  *Id.* at
847.  Accordingly, notwithstanding the applicability of the rules cited in this Opinion, the Sixth Circuit's decision to deny
summary judgment is distinguishable in all material respects.

[20] Although *Sturgill* involved a motion to dismiss, the Sixth Circuit's guidance on this point is nevertheless instructive.
114 F.4th at 810.  Indeed, the Sixth Circuit cites to *Callahan*—a case involving summary judgment—as support for the
proposition that overlap between a religious and secular view is permissible under Title VII.  658 F.2d at 684.

30

*Sturgill*, 114 F.4th 803; *see also Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); *Seeger*, 380 U.S. at 184–85 ("[T]he 'truth' of a belief is not open to question . . . .'"); *Jones*, 1986 WL 398289, at *3 ("It is not for a court to evaluate the legitimacy of a belief that is claimed to be religious."). Thus, the operative question at this stage is whether Bobnar's convictions or beliefs are, in his "own scheme of things, religious." *Welsh*, 398 U.S. at 339; *Seeger*, 380 U.S. at 185; *see also Jones*, 1986 WL 398289, at *3.

For the following reasons, the Court concludes that Bobnar held, at all relevant times, religious beliefs that conflicted with the Mandate and were sufficient to warrant Title VII protections.

AstraZeneca contends that Bobnar has failed to demonstrate that his "personal conviction" was based on a religious "scheme of things," relying in large part on *Africa v. Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981). (Doc. No. 36-1 at PageID# 770; Doc. No. 39 at PageID# 958.) AstraZeneca asks the Court to apply the three-factor framework from *Africa* and find that Bobnar's convictions are not based on a religious "scheme of things" and therefore do not warrant Title VII protections. (Doc. No. 36-1 at PageID# 770.)

In *Africa*, the Third Circuit considered prisoner Frank Africa's ("Africa") claim that, under the First Amendment, Pennsylvania would not provide him with a "special diet consisting entirely of raw foods" despite his contention that "to eat anything other than raw foods would be a violation of his 'religion.'" 662 F.2d at 1025. Africa claimed to be a "naturalist minister" for the "MOVE" organization, a religion formed by John Africa which plaintiff Africa contended was a legitimate religion set on, among other things, bringing about peace and ending corruption. *Id.* at 1026.

The Third Circuit concluded that his beliefs were "truly held," and then considered whether they were religious in nature.  *Id.* at 1030–31.  The Third Circuit acknowledged that, determining whether Africa and MOVE's beliefs are "religious" and entitled to First Amendment protection "presents a most delicate question."  *Id.* at 1031 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215–16 (1972)) (quotation marks omitted).  Nonetheless, the Third Circuit concluded that "the very concept of ordered liberty precludes allowing" an individual to "make his own standards of conduct in which society as a whole has important interests," coining the term "blanket privilege" to describe this situation.  *Id.* (citing *Yoder*, 406 U.S. at 215–16 (quotation marks omitted)).  The Third Circuit then applied the following three-factor test to determine whether a "religious" belief is actually religious: "First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters.  Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching.  Third, a religion often can be recognized by the presence of certain formal and external signs."  *Id.* at 1032.

Applying these factors, the Third Circuit concluded that Africa's MOVE organization was not a religion.  *Id.* at 1032, 1036.  Specifically, the MOVE organization made no mention of a "fundamental concern," did not claim to be theistic or take a position with respect to major issues such as morality or life's purpose and appeared to be based in secular philosophy.  *Id.* at 1033–35. Further, MOVE did not appear to share a "world view" comparable to other recognized religions but instead had a "single governing idea" and was therefore not sufficiently comprehensive.  *Id.* at 1035. Lastly, MOVE lacked almost "all of the formal identifying characteristics common to most recognized religions," such as special services, official customs, holidays, and an organizational

32

structure. *Id.* at 1035–36. Therefore, according to the Third Circuit, Africa's MOVE organization was not a religion under the First Amendment despite Africa's claims of religious belief.

According to AstraZeneca, under *Africa*, Bobnar's representation that he was "convicted" by the Holy Spirit to not receive the vaccine was a "personal choice" and an "isolated teaching," and not a "comprehensive religious belief,"[21] and therefore, Bobnar has not shown that his objection to the Mandate was based on a "religious scheme of things." (Doc. No. 36-1 at PageID# 769–70; Doc. No. 39 at PageID# 956–57.)

Bobnar frames the proper test as one of determining whether an objection to a vaccine mandate falls on the "religious or secular side of the line." (Doc. No. 37 at PageID# 916–17.) He argues that *Africa* does not apply to his Title VII claim, as it involved a First Amendment claim, and is also factually distinguishable. (*Id.* at PageID# 916–20 (citation omitted).) AstraZeneca responds by claiming that *Africa* was merely a "restatement" of prior Supreme Court precedent.[22] (Doc. No. 41 at PageID# 1138.)

---

[21] AstraZeneca, citing *Africa*, uses the term "comprehensive religious belief" to describe Title VII's requirement. (*See, e.g.*, Doc. No. 36-1 at PageID# 774.) *Africa* does not use this term in its discussion of the three-factor framework, and instead refers to the factor as a "comprehensive belief system." *Africa*, 662 F.2d at 1035.

[22] AstraZeneca relies on *Wisconsin v. Yoder* as the genesis of *Africa*'s doctrine. 406 U.S. 205, 215–16 (1972) ("Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests."). *Yoder* was a First Amendment Free Exercise Clause case and discussed in part whether the claimed religion (Amish) was a recognized religion for purposes of protection of the Religion Clauses. *Id.* The Supreme Court ultimately concluded that the Amish religious faith and their mode of life was in-fact "not merely a matter of personal preference, but one of deep religious conviction . . . ." Furthermore, nearly a decade after *Yoder*, the Supreme Court revisited the issue of determining religious beliefs in *Thomas*. 450 U.S. at 713–14. Despite expressly acknowledging *Yoder* for the proposition that only beliefs rooted in religion are protected, the Supreme Court nevertheless determined that the resolution of what is a "religious" belief or practice should not "turn upon a judicial perception of the particular belief or practice in question." *Id.* The Supreme Court emphasized that religious beliefs "need not be acceptable, logical, consistent, or comprehensible to others" to merit protections—indeed, "[c]ourts are not arbiters of scriptural interpretation." *Id.* at 714, 716. Accordingly, AstraZeneca's argument on this point is unavailing.

As a preliminary matter, the Court agrees with Bobnar that the facts of *Africa* are clearly distinguishable from the facts involved herein. *Africa* involved an individual who, essentially, created his own religion, enlisted his family members to join it, and claimed that the Pennsylvania correctional systems were required to accommodate his dietary restrictions under his "religion." *See* 662 F.2d at 1025.[23] Instead, the instant case involves Bobnar's beliefs as a non-denominational follower of Christianity, which Nichols acknowledged or agreed is an established religion. (Nichols Dep. at Tr. 41, 102–03). *Africa* is therefore not instructive in the instant case.[24]

Beyond *Africa*'s dissimilarities, *Africa* is still not binding on this Court. This Court has not found, and AstraZeneca has not cited to, any binding[25] Supreme Court or Sixth Circuit case law that

---

[23] The *Africa* court itself acknowledged that its conclusion that Africa's MOVE organization was not based on a comprehensive system of beliefs "is not unassailable." *Africa*, 662 F.2d at 1035. In doing so, the *Africa* court opined that "[i]t could be argued that Africa's views are in a sense comprehensive." *Id.*

[24] Even if the Court applied *Africa*, however, Bobnar's convictions or beliefs would satisfy *Africa*'s three-factor definition of "religion." In particular, AstraZeneca only disputes that Bobnar's convictions fail to meet *Africa*'s second factor, arguing that they are not based on a comprehensive system of beliefs. (Doc. No. 36-1 at PageID# 770.) As Bobnar points out, AstraZeneca's contention is undermined by its approval of Wood's Request. (Doc. No. 33-1 at PageID# 309; Doc. No. 37 at PageID# 916, 921–22.) Indeed, in his Request, Wood claimed to have the same two beliefs that Bobnar espoused and which AstraZeneca now challenges—that his body is a temple, and that God and/or the Holy Spirit convicted him to refuse the vaccine. (Wood Dep. Ex. C; Bobnar Dep. Ex. 27.) And Wood likewise shared Bobnar's abstinence from alcohol, tobacco, drugs, smoking, and getting tattoos. (Wood Dep. Ex. C; Bobnar Dep. Ex. 27.) Additionally, Wood's Request contained several of the same Bible verses that Bobnar's did. (Wood Dep. Ex. C. at PageID# 617; Bobnar Dep. Ex. 25 at PageID# 1547.) In all material respects, therefore, Wood and Bobnar's Requests were indistinguishable. But oddly, Nichols believed that only Bobnar's Request "lack[ed] . . . the tie-in to a specific tenet or belief" or an explanation as to why "that specific belief actually prevent[ed] him from getting a COVID-19 vaccine." (Nichols Dep. at Tr. 39, 65–66.) If AstraZeneca considered Bobnar's beliefs insufficient under *Africa*, Wood's beliefs should have been equally insufficient, and yet AstraZeneca granted Wood's Request.

[25] AstraZeneca cites *Carpenter v. Wilkinson*, 946 F. Supp. 522, 526 (N.D. Ohio 1996) to suggest that Northern District of Ohio courts apply *Africa* to determine the existence of a religion. (Doc. No. 36-1 at PageID# 770.) *Carpenter* did expressly reference *Africa* as providing three "useful indicia" to determine "the existence of a religion protected by the First Amendment." 946 F. Supp. at 526. However, although *Carpenter* referenced *Africa* and discussed its three-factor framework, the court explicitly stated that it would not "definitively decide" whether the plaintiff's claimed belief was a religion and instead presumed that it was protected by the First Amendment. *Id.* at 528–29. Moreover, *Carpenter* is not binding and has not been cited with approval by the Sixth Circuit.

has adopted *Africa*'s three-factor framework for religious accommodations under Title VII.[26]  *See Amos v. Lampo Grp.*, 2023 WL 8631674, at *10 (M.D. Tenn. Dec. 13, 2023) ("The Sixth Circuit apparently has not weighed in on the Third Circuit's approach . . . ."), *rev'd on other grounds*, 2024 WL 3675601 (6th Cir. Aug. 6, 2024).  However, the Second Circuit has refused to apply *Africa*'s "narrow definition of 'religious belief,'" even in the context of a First Amendment case, finding instead that an "expansive conception of religious belief" applies.  *See Patrick v. Le Fevre*, 745 F.2d 153, 156–58, 160 n.8 (2d Cir. 1984) (finding that lower court was incorrect in concluding as a matter of law that, based on *Africa*, plaintiff's beliefs were not religious in nature); *see also E.E.O.C. v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 396 (E.D.N.Y. 2016) (declining to follow *Africa* despite defendants' insistence, citing the *Patrick* court's rejection of *Africa*, and concluding that plaintiff's Onionhead belief was a religion for Title VII purposes).

Although the Sixth Circuit has not expressly addressed *Africa*, its recent decisions in *Lucky v. Landmark Med. of Mich., P.C.*, and *Sturgill v. American Red Cross*, suggest a hesitation to allow courts to inquire into the centrality of an individual's religious beliefs or whether an objection to an employer's requirement ties into a "specific tenet or principle" of his beliefs.  103 F.4th 1241 (6th Cir. 2024); 114 F.4th 803 (6th Cir. 2024).

In *Lucky*, the Sixth Circuit reversed the lower court's granting of a motion to dismiss, which relied in part on *Africa*, because the district court did not "have any basis for its insistence that Lucky

---

[26] The only Sixth Circuit case the Court has located that mentions *Africa* (or its progeny *Fallon v. Mercy Cath. Med. Ctr. of Se. Penn.*, 877 F.3d 487 (3d Cir. 2017), which applied *Africa* to Title VII cases) is *Cutter v. Wilkinson*, a case involving the interpretation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc–2000cc-5.  349 F.3d 257, 259, 268 (6th Cir. 2003).  In *Cutter*, however, the Sixth Circuit cited *Africa* not for its three-factor framework, but instead for the mere proposition that the *Africa* court held that "a prisoner's belief system was not a religion for purposes of First Amendment analysis."  *Id.*  *Cutter* was later reversed on other grounds by the Supreme Court.  *See Cutter v. Wilkinson*, 544 U.S. 709 (2005).

explain how her religion has a specific tenet or principle that does not permit her to be vaccinated." 103 F.4th at 1243 (internal quotation marks omitted). The Sixth Circuit opined that reality is "[q]uite the contrary: It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Id.* (internal quotation marks omitted) (citing *Emp. Div. v. Smith*, 494 U.S. 872, 887 (1990), and *Hernandez*, 490 U.S. at 699).

Two months later, the Sixth Circuit reiterated this point in *Sturgill*, once again reversing the district court's granting of a motion to dismiss a failure to accommodate claim Under Title VII. 114 F.4th at 811. The Sixth Circuit explained that First Amendment jurisprudence "commands that courts may not question the veracity of one's religious beliefs." *Id.* at 809 (citing *Hernandez*, 490 U.S. at 699, and *Thomas*, 450 U.S. at 714). And with respect to identifying specific tenets of religion, the Sixth Circuit explicitly stated that Sturgill was not required to "cite to any tenet of the Lutheran church that opposes western medicine in general or the COVID vaccine specifically." *Id.* (alterations omitted).[27]

---

[27] The Court recognizes that both *Lucky* and *Sturgill* were decided within the context of a motion to dismiss rather than summary judgment. 103 F.4th at 1242; 114 F.4th at 807. Indeed, the Sixth Circuit recognized in *Sturgill* that it was operating under a plausible-pleading standard rather than the prima facie evidentiary standard applicable when evaluating summary judgment motions, and that plaintiff's alleged facts would be tested during discovery, summary judgment, and trial. 114 F.4th at 808 n.1, 810–11. Nonetheless, the Court finds these cases relevant to the issue at-hand. First, as explained *supra*, the notion that courts are not to question the veracity of religious beliefs is well-established by the Supreme Court. Second, the U.S. Equal Employment Opportunity Commission ("EEOC") has expressly adopted this point in their guidance document on religious discrimination. *See* EEOC Compliance Manual § 12-I(A)(1) (Jan. 15, 2021) ("The Supreme Court has made it clear that *it is not a court's role to determine the reasonableness of an individual's religious beliefs,* and that 'religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.' An employee's belief, observance, or practice can be 'religious' under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief, observance, or practice, or if few – or no – other people adhere to it."). Finally, *Sturgill* references other Circuit courts that have reached the same conclusions at the summary judgment stage. *See, e.g.*, *Callahan v. Woods*, 658 F.2d 679 (9th Cir. 1981) (cited by *Sturgill* and reaching similar conclusions in the context of summary judgment).

The Court therefore concludes that *Africa*'s three-factor "narrowing" framework invites the type of inquiry into the centrality or validity of an individual's beliefs that the Sixth Circuit has cautioned against, and that a "more expansive" approach is appropriate. *United Health*, 213 F. Supp. 3d at 396; *accord Chinnery v. Kaiser Found. Health Plan*, 2024 WL 3152348, at *4 (E.D. Va. June 24, 2024) (declining to employ *Africa*'s framework because "cries of arbitrary—and impermissible—judicial subjectivity" and "stands antithetical to the Supreme Court's repeated and emphatic guidance in this area").

The Court agrees with Bobnar that the appropriate lens through which a plaintiff's religious beliefs should be evaluated at summary judgment is whether there is an indication that a claimed religious belief is instead a non-religious belief. *See Welsh v. United States*, 398 U.S. 333, 339 (1970) (establishing benchmark as whether an individual's beliefs are, "in his own scheme of things, religious"); *Lucky*, 103 F.4th at 1243 (defining Title VII inquiry as whether claimant pled facts supporting inference that "her refusal to be vaccinated for Covid was an aspect of her religious observance or practice or belief") (internal quotation marks omitted); *Devore*, 118 F.4th at 845 (noting that Title VII protections attach to "practices rooted in religious principle, but not to purely secular beliefs, such as those that are essentially political, sociological, or philosophical") (internal quotation marks omitted); *Bellard v. Univ. of Tex. MD Anderson Cancer Ctr.*, -- F. Supp. 3d -- , 2024 WL 1079221, at *8 (S.D. Tex. Feb. 9, 2024) (observing test as one of "[d]etermining which side of the religious-secular line requests for COVID-19 vaccine exemptions fall"). Thus, courts should determine whether the evidence shows that a plaintiff's sincerely and truly held beliefs supporting his refusal to comply with his employer's requirement have a religious basis or, instead, have a purely

secular, philosophical, or medical, or other non-religious basis.[28]  With this principle in mind, the Court must now determine whether there is any indication that Bobnar's objection to the vaccine was not based on religious reasons.

The Court concludes as a matter of law that Bobnar objected to the Mandate because of his religious beliefs.  Bobnar represented several times, in his Request and in his response to AstraZeneca's follow-up prompt, that he was convicted by the Holy Spirit not to take the COVID-19 vaccine.  (Bobnar Dep. Ex. 25 at PageID# 1547; Nichols Dep. Ex. B. at PageID# 533.)  Under the test set forth above, this is sufficient to demonstrate a religious belief.  *See Bellard*, 2024 WL 1079221, at *8 (*prima facie* case established where plaintiffs "ma[d]e clear that their principal rationale in refusing the vaccine was to follow God's will" and that they were "directed by God not to take the vaccine"); *Redmond v. GAF Corp.*, 574 F.2d 897, 900 (7th Cir. 1978) (finding protected under Title VII conduct that is "religiously motivated . . . however eccentric"); *Davis v. Fort Bend County*, 765 F.3d 480, 485 (5th Cir. 2014) (same).  Bobnar's Request also included twenty-five bible passages, the background of his religious upbringing, and that his continued religious practice impacts every area of his life.  (Bobnar Dep. Ex. 25 at PageID# 1545-1549.)

Further, there is no evidence that Bobnar had other motivations for seeking his accommodation.  Nichols even testified that he had no reason to believe "that [Bobnar] was motivated for non-religious reasons to seek the religious accommodation," and that Bobnar had not provided

---

[28] As explained *supra*, the fact that there may be both religious and secular reasons for a belief does not elevate the latter over the former.  *Sturgill*, 114 F.4th at 810 (citing *Callahan*, 658 F.2d at 684 ("[A] coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one."), and *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901 (8th Cir. 2024) (similar)).  EEOC's guidance document confirms the same.  *See* EEOC Compliance Manual § 12-I(A)(1) (Jan. 15, 2021) ("[O]verlap between a religious and political view does not place it outside the scope of Title VII's protections, as long as that view is part of a comprehensive religious belief system and is not simply an isolated teaching . . . The same practice might be engaged in by one person for religious reasons and by another person for purely secular reasons.").

any information that would lead him to believe that he "had nonreligious objections based on philosophy or sociological concerns."  (Nichols Dep. at Tr. 46, 66.)  AstraZeneca has pointed to no evidence suggesting that Bobnar had any non-religious basis for refusing to take the COVID-19 vaccine.  And even if AstraZeneca could muster an independent non-religious basis, that would not impact Bobnar's claim because the "coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one."  *Sturgill*, 114 F.4th at 810.  The Court therefore finds that the record demonstrates that Bobnar had religious beliefs preventing him from receiving the COVID-19 vaccine.

Nevertheless, AstraZeneca argues that Bobnar's religious beliefs or convictions do not "qualify for an accommodation" because they are an impermissible "blanket privilege," which according to AstraZeneca, cannot establish a "religious scheme of things."  (Doc. No. 36-1 at PageID# 770, 773; Doc. No. 39 at PageID# 957–58.)

Even where an employee holds a religious belief, some courts find that that said belief may not demonstrate a religious "scheme of things" warranting an accommodation if it amounts to a "blanket privilege."[29]  In particular, "the very concept of ordered liberty" precludes allowing any person a "blanket privilege 'to make his own standards on matters of conduct in which society as a

---

[29] Although the Third Circuit in *Africa* appeared to have coined the term "blanket privilege," many courts from around the country have utilized the "blanket privilege" terminology without expressly acknowledging, following, or adopting *Africa*'s three-factor framework.  For example, in *Prida v. Option Care Ents., Inc.*, 2023 WL 7003402 (N.D. Ohio Oct. 24, 2023), a COVID-19 vaccine case which the parties discuss in depth (Doc. Nos. 37, 41), the court granted defendant's Rule 12(b) motion to dismiss due to, in part, the plaintiff's alleged concerns about the chemicals used in and the medical side effects from the COVID-19 vaccine.  2023 WL 7003402, at *5.  The *Prida* court found that the plaintiff's "largely secular beliefs" were an attempt to procure a "blanket privilege and a limitless exclude for avoiding all unwanted obligation," without citing to or referencing *Africa* or its framework.  *Id.* at *6 (citation omitted).

And in any event, *Prida* is distinguishable.  Unlike the instant case, the *Prida* plaintiff had a clear non-religious basis for objecting to the vaccine.  Further, the *Prida* court evaluated the defendant's motion to dismiss using the *prima facie* standard.  *Id.* at *3.  As the Sixth Circuit confirmed in *Lucky*, the *prima facie* standard is an evidentiary standard and not a pleading standard.  103 F.4th 1241, 1244 (6th Cir. 2024).

whole has important interests.'"  *Africa*, 662 F.2d at 1031 (quoting *Yoder*, 406 U.S. at 215–16).

Outside of the Third Circuit, where *Africa* is binding, the cases (including those that AstraZeneca

cites, Doc. No. 36-1 at PageID# 770–71) that have found that a claimed religious belief is

"impermissible" blanket privilege or would grant an employee "carte blanche" tend to involve an

element of *personal choice*, decision, or practice (or a personal "will" or "conscience"), as opposed

to a conviction, command, or order[30] from a higher religious being.[31]  *See, e.g.*, *Foshee v.*

*AstraZeneca Pharms. LP*, 2023 WL 6845425, at *5 (D. Md. Oct. 17, 2023) (plaintiffs who did not

want to take the vaccines and whose consciences therefore "[told] them not to do it" believed it was

in "God's will or in accord with the Holy Spirit that they follow their consciences"); *DeVore v. Univ.*

---

[30] One of the cases AstraZeneca cites, *Lucky v. Landmark Med. of Mich., P.C.*, involved a plaintiff's claim that she was directed by God that she would suffer spiritual harm if she received the COVID-19 vaccine, which the district court found to be an impermissible blanket privilege.  2023 WL 7095085, at *1, *4 (E.D. Mich. Oct. 26, 2023), *rev'd*, 103 F.4th 1241 (6th Cir. 2024).  As AstraZeneca acknowledges, the district court's decision was later reversed.  (Doc. No. 43.) 103 F.4th 1241 (6th Cir. 2024).

[31] Although two cases cited by AstraZeneca, *Ellison v. Inova Health Care Services*, 692 F. Supp. 3d 548 (E.D. Va. 2023) and *Griffin v. Mass. Dep't. of Revenue*, 2023 WL 4685942 (D. Mass. July 20, 2023), involved some discussions of religion, those cases are distinguishable.  First, both *Ellison* and *Griffin* expressly cite to *Africa* to apply the Third Circuit's approach—which this Court has declined to do.  692 F. Supp. 3d at 557–59 (applying *Africa* and noting that neither party objected to the use of the *Africa* standard in their briefings); 2023 WL 4685942, at *5–6 (applying *Africa* and Third Circuit's approach).  Second, in *Ellison*, the plaintiff's objections were found to be medical in-nature.  692 F. Supp. 3d at 558.  Specifically, the plaintiff objected that the COVID-19 vaccine, as opposed to other vaccines, was a "medication that could induce harm."  *Id.*  The plaintiff supported his objections with references to his "personal analyses" of CDC and FDA databases in which he concluded that "there is a 28 times more likely chance of adverse reactions from the COVID-19 vaccines in the last 15 months, than from *any of the other 50+ vaccinations*."  *Id.* (emphasis added).  Thus, it was apparent that the plaintiff's objections centered on the medical *safety* of the COVID-19 vaccine specifically, not vaccines generally.  Third, in *Griffin*, the plaintiff provided "no religious principles that guide[d] her objection" to the vaccine, such as the belief that her body was a temple and did not "describe her religious beliefs or principles in any meaningful way."  2023 WL 4685942, at *2, 7.  Thus, the bare assertion that God had "shown" her that she should not receive the vaccine, without more, was insufficient.  *Id.* at 7.  This is distinguishable from Bobnar whose religious beliefs were thoroughly discussed in his accommodations request, which included twenty-five bible passages, the background of his religious upbringing, and that his continued religious practice impacts every area of his life.  (Bobnar Dep. Ex. 25 at PageID# 1545-1549.)  Finally, neither *Ellison* nor *Griffin* is binding on this Court.

*of Ky. Bd. of Tr.*, 693 F. Supp. 3d 757, 763 (E.D. Ky. 2023) (plaintiff's claimed belief was, in part, that she "must be able to choose what shall or shall not happen to her") (citation omitted).[32]

The Court finds that Bobnar's beliefs are distinct from those found to constitute "blanket privileges."  In this case, Bobnar informed AstraZeneca that his conviction to not receive the COVID vaccine came from God and the Holy Spirit.  There is no indication that Bobnar instead objected to or refused the COVID-19 vaccine because "God gave him free will" or because it would go against his "conscience."  None of the authorities (outside of the Third Circuit or cases expressly adopting the Third Circuit's approach) AstraZeneca cites involved the denial of relief to an individual who objected to an employer's requirement based on a directive from God or the Holy Spirit, and therefore are not instructive here.

AstraZeneca's treatment of Wood's Request undermines its assertion that Bobnar's Request is an impermissible blanket privilege.  (Doc. No. 36-1 at PageID# 769–70; Doc. No. 39 at PageID# 959, 962; *see* Doc. No. 43 at PageID# 1242.)  Wood and Bobnar's Requests, and in particular their reliance on some of the same Bible verses and their key representations that each of their bodies is a "temple" and that as a result they abstain from using alcohol, tobacco, and drugs and receiving tattoos, are materially indistinguishable.[33]  (Wood Dep. Ex. C at PageID# 617–18; Nichols Dep. Ex. B at

---

[32] The Sixth Circuit recently affirmed the lower court's decision in *Devore*.  *See DeVore v. Univ. of Ky. Bd. of Tr.*, 118 F.4th 839 (6th Cir. 2024).  In its decision, the Sixth Circuit highlighted the fact that Devore offered "no other evidence to show a conflict between her religion and the Policy," "no affidavit or declaration articulating how complying with the Policy conflicts with her religious beliefs or practices," and "never identified in the record what her religion is."  *Id.* at 847–48.  Rather, the only reference to religion appears to be the "conclusory statement" in her unverified complaint that she objected to mandatory Covid testing "due to her deeply held religious beliefs."  *Id.* at 848.  Accordingly, the Sixth Circuit concluded that Devore's objections were "secular" in nature rather than religious.  *Id.* at 846–47 (discussing Devore's objections regarding health risks and secular philosophies including the "right to choose," "coercion," "justice, righteousness, all that is honorable and true," and mandatory testing being "inequitable and unfair").

[33] Minor differences between Bobnar and Wood's Requests include, for example, Wood's lack of piercings, exercise routine, use of prescription medication, existence of comorbidities, and a prior bout of COVID-19, which were absent from Bobnar's Request.  (Wood Dep. Ex. C at PageID# 618.)  These assertions were apparently not material to

41

PageID# 553.) Yet when presented with nearly identical information, AstraZeneca granted one request and denied the other.[34] Based on these material similarities between Wood and Bobnar's Requests, the Court does not see why, if Wood's Request was sufficient, Bobnar's Request was instead an impermissible blanket privilege.[35]

With no evidence of or indication that Bobnar did not have a religious basis for refusing the vaccine, the Court concludes that Bobnar has sufficiently demonstrated that there is no genuine dispute that he had a sincerely held religious belief. Accordingly, and because the other two elements of his *prima facie* case are not disputed, Bobnar has satisfied his burden of showing a *prima facie* Title VII religious accommodation case.

### 2. Undue Hardship

Having concluded that Bobnar has demonstrated a *prima facie* case of religious discrimination, the Court now considers whether AstraZeneca would have experienced an undue hardship by accommodating Bobnar's Request.[36]

Title VII requires an employer to accommodate an employee's religious practice "unless doing so would impose an 'undue hardship on the conduct of the employer's business.'" *Groff v.*

---

AstraZeneca's decision, since AstraZeneca's follow-up in which it requested supplemental information did not inquire about Bobnar's gym habits, stance on vaccinating his children, or otherwise. (Bobnar Dep. Ex. 27 at PageID# 1554.)

[34] As explained previously, the denial of Bobnar's accommodations request is evaluated based on the information that AstraZeneca had at the time of the adverse decision. *See supra* note 1.

[35] AstraZeneca also suggests that Wood and Bobnar's Requests cannot be compared (and that its decision to grant another employee's accommodation request is "irrelevant") because Title VII "requires an individualized assessment," quoting *Bacon v. Honda of Am. Mfg.*, 205 F.R.D. 466, 479 (S.D. Ohio 2001). (Doc. No. 39 at PageID# 960.) The portion of the *Bacon* opinion AstraZeneca refers to appears in the discussion of whether class certification is warranted due to the plaintiffs' alleged commonality under Rule 23, not whether Title VII plaintiffs can ever utilize comparators for religious discrimination. *See Bacon*, 205 F.R.D. at 479. *Bacon* is therefore inapposite to the instant case.

[36] Only Bobnar seeks summary judgment as to whether AstraZeneca can demonstrate undue hardship. (Doc. No. 33-1 at PageID# 315–17.)

42

*DeJoy*, 600 U.S. 447, 453–54 (2023) (quoting 42 U.S.C. § 2000e(j)); *see also Odell v. Kalitta Air, LLC*, 107 F.4th 523, 531–32 (6th Cir. 2024) (citing *Groff*, 600 U.S. at 468). In this context, "undue hardship is something greater than hardship." *Crider v. Univ. of Tenn.*, 492 F. App'x 609, 613 (6th Cir. 2012) (quoting *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975)); *Groff*, 600 U.S. at 469, 471 ("[A] hardship is more severe than a mere burden[, and] . . . adding the modifier 'undue' means that the requisite burden, privation, or adversity must rise to an 'excessive' or 'unjustifiable' level.").

To demonstrate undue hardship, an employer "must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470 (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 83 n.14 (1977))).[37] The Supreme Court has instructed courts to "apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470–71 (citation omitted). Courts should also endeavor to "resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test." *Id.* at 469, 471. Hardships that are attributable to "employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice" are "off the table" and "cannot be considered 'undue.'" *Id.* at 472.

---

[37] The *Groff* decision clarified *Hardison*, an earlier Supreme Court precedent which had been interpreted by lower courts to require only more than a "*de minimis*" cost to demonstrate undue hardship. *See Groff*, 600 U.S. at 465, 468–70 (citing *Hardison*, 432 U.S. at 97). The Sixth Circuit has not yet interpreted *Groff*'s holding in a Title VII religious accommodation case outside of the collective bargaining agreement context. *See Odell*, 107 F.4th 523.

In his Motion for Partial Summary Judgment, Bobnar indicates that the appropriate accommodation that AstraZeneca could have provided was a seven-month continuation of the weekly COVID-19 PCR testing (and later antigen testing) that Bobnar and 800 other employees had been undergoing prior to the Mandate.  (Doc. No. 33-1 at PageID# 315–16.)  According to Bobnar, continued testing would not have posed an undue hardship because there is no evidence that any of his customers were aware of his vaccine status or complained about his lack of vaccination, and employees were not required to disclose such status to any customer.  (Doc. No. 33-1 at PageID# 309–10, 316.)  Further, there is no evidence that AstraZeneca lost sales or sales opportunities as a result of his vaccination status, and Bobnar's largely remote work "would have limited physical contact with other employees."  (*Id.*)  Lastly, Bobnar contends that there is no evidence that unvaccinated employees transmitted the virus at a higher rate than its vaccinated employees.  (*Id.* at PageID# 310, 316.)

For the following reasons, the Court concludes that AstraZeneca has not demonstrated that accommodating him would have posed an undue hardship.[38]

AstraZeneca first argues that permitting Bobnar to perform his job remotely would have created undue "operational" hardship because he was "significantly more effective" in-person.  (Doc. No. 39 at PageID# 946, 949, 962–63.)  The Court is not persuaded that occasional remote work demonstrates undue hardship on AstraZeneca.  Although Bobnar testified that it was "easier" and

---

[38] As a preliminary matter, the Court recognizes that it should consider, for the purposes of the undue hardship evaluation, only the information and evidence available to AstraZeneca at the time of Bobnar's discharge.  *MacDonald v. Or. & Health Sci. Univ.*, 2024 WL 3316199, at *7 (D. Or. July 5, 2024) ("Title VII does not require employers to predict the future."); *see also Kluge v. Brownsburg Comm. Sch. Corp.*, 64 F.4th 861, 888 (7th Cir. 2023), *decision vacated*, 2023 WL 4842324 (7th Cir. July 28, 2023) (remanding case to district court to apply *Groff*).  Therefore, the fact that AstraZeneca would have needed to allow Bobnar to continue testing for seven months (from his discharge on April 29, 2022, until the end of testing on January 5, 2023) will not be considered in determining whether AstraZeneca would have experienced an undue hardship at the time it denied Bobnar's Request and subsequently discharged him.

44

"always [] better" to meet his customers in person to avoid technology glitches and misinterpretation, these in-person visits would often be made alone, and not with any other AstraZeneca staff.  (Bobnar Dep. at Tr. 176, 182; Wood Dep. at Tr. 17–18.)  Indeed, it is undisputed that, before his discharge, Bobnar was already having these conversations in-person and undergoing weekly testing.  (Criddle Dep. at Tr. 24; Bobnar Dep. at Tr. 198.)  Thus, the mere fact that in-person conversations were more productive does not show that allowing Bobnar to test weekly would have created "substantial costs" for AstraZeneca.[39]

AstraZeneca does not point to any evidence that, for example, any of its customers (hospitals, physicians, or otherwise) or applicable law or regulation required Bobnar to have a COVID-19 vaccine to visit his customers, and that Bobnar's refusal to get a vaccine would have prevented him from doing so.  *Isensee v. Amplity, Inc.*, 2024 WL 2132419, at *8 (S.D. Ohio May 13, 2024) (summary judgment denied for defendant because it "offer[ed] no proof that customers were requiring vaccinations in the areas covered by [plaintiff]"); *cf. Taylor v. SEPTA*, 2024 WL 3203318, at *27–28 (E.D. Pa. June 27, 2024) (undue hardship demonstrated where accommodation would have required defendant to violate federal regulations).  In fact, Bobnar himself was unaware of any hospital policy requiring sales representatives to be vaccinated to visit in-person.  (*See* Bobnar Dep. at Tr. 192–93.)  And in discovery, AstraZeneca represented that it is not in possession, custody, or control of information regarding "the specific vaccination requirements of [Bobnar's] customers."  (Doc. No. 34-1 at PageID# 553.)

---

[39] Exactly how much of Bobnar's time was spent interacting with customers in-person is unclear—Bobnar claims it was 95%, and Wood testified that on a "day-to-day basis," Bobnar's work would be done from home.  (Bobnar Dep. at Tr. 172; Wood Dep. at Tr. 17–18.)  But even if Bobnar's role required him to be in-person 95% of the time, this proportion is of no moment, as Bobnar seemingly would have, if he had provided the "specific tenet" AstraZeneca required to grant his accommodation, simply continued to visit his customers in-person at the same rate.  (Wood Dep. at Tr. 59 (noting day-to-day duties and responsibilities did not change after exemption granted).)

There is likewise no evidence that AstraZeneca would suffer other substantial costs, lost sales, or decreased business due to Bobnar's vaccination status, and Wood testified that he "did not know" of any such lost sales.  (Wood Dep. at Tr. 35–36.)  *See Isensee*, 2024 WL 2132419, at *8 ("The loss of a customer likely would be an undue hardship for Amplity when viewing the practical effects it would have on the company.  The issue is there is no evidence that Amplity would have lost Organon as a customer if it had allowed [employee] to continue to work remotely.") (citations omitted); *cf.* (C.D. Cal.  *Bordeaux v. Lions Gate Entm't, Inc.*, 703 F. Supp. 3d 1117, 1135–362023) (undue hardship where, in part, it was estimated that cost of central cast member to movie production contracting COVID-19 would be "between $150,000.00–$300,000.00 per day" and risk of production delays or shutdown was prevalent).  Therefore, even if allowing Bobnar to occasionally work remotely would cause him to be less effective from time to time, AstraZeneca has not shown that this would amount to a "substantial cost" sufficient to find undue hardship.

AstraZeneca next argues that a genuine dispute of material fact exists regarding whether permitting Bobnar to "perform his primary duties of interacting with pulmonologists, allergists, and ear, nose, and throat ("ENT") doctors while unvaccinated" would have created an undue hardship. (Doc. No. 39 at PageID# 945.)  AstraZeneca contends that Bobnar's role "required regular face-to-face interactions with customers in healthcare and other settings" and his continued unvaccinated employment as a biologic sales specialist posed "significant health risks" for AstraZeneca's customers and their patients, the latter of whom AstraZeneca claims "were at high risk for contracting COVID-19."  (*Id.* at PageID# 946, 949.)

The Court concludes that Bobnar's interactions with his customers are insufficient to demonstrate undue hardship.  Some courts, as AstraZeneca points out, have considered significant

46

health risks posed to its other employees by an unvaccinated employee in the midst of the pandemic as indicating an undue hardship.  *See, e.g.*, *Villareal v. Rocky Knoll*, 2022 WL 17092090, at *7–9 (E.D. Wis. Nov. 21, 2022) (defendant health care center); *MacDonald v. Or. & Health Sci. Univ.*, 2024 WL 3316199, at *12 (D. Or. July 5, 2024) (defendant hospital system); *Adams v. Mass General Brigham Inc.*, 2023 WL 6318821, at *6–8 (D. Mass. Sept. 28, 2023) (defendant hospital system). However, these cases appear to have one feature in common—the defendant employer introduced some evidence of the risks of contracting COVID-19 posed by an unvaccinated employee or the likelihood of the spread of COVID-19 in its facilities, or the efficacy of the virus in limiting that spread and/or health risks, in a healthcare or similar workplace.  *Villareal*, 2022 WL 17092090, at *7; *MacDonald*, 2024 WL 3316199, at *8–11; *Adams*, 2023 WL 6318821, at *7; *see also Petersen v. Snohomish v. Reg'l Fire & Rescue*, 2024 WL 278973, at *6–7 (W.D. Wash. Jan. 25, 2024) ("[T]he uncontroverted evidence . . . demonstrates that unvaccinated firefighters were at a higher risk of contracting and transmitting COVID-19 . . . .").  In this instance, AstraZeneca has not pointed to any evidence that would show increased health risks that an unvaccinated biologic sales representative would pose to its healthcare provider customers or their patients.[40]   AstraZeneca's reference to Bobnar's testimony that he was "on the frontlines" of COVID is insufficient to demonstrate any *risk* that a customer or patient would contract it.

---

[40] AstraZeneca also insists that granting a "larger number of exemptions, even for a few months, would have increased the risk of COVID-19 transmission and significantly impacted safety."  (Doc. No. 39 at PageID# 964.)  The Court disagrees.  Bobnar does not argue that *multiple* other exemptions should have been granted, but instead, that *his* should have been.  In any event, as noted above, AstraZeneca does not provide any evidence that granting Bobnar's accommodation would have increased the risk of COVID-19 transmission and "significantly impacted" safety.  Thus, AstraZeneca cannot rely on a "what if everyone requested the same accommodation" defense.  *See Bellard*, 2024 WL 1079221, at *9 (citing *Hebrew v. Tex. Dep't of Crim. Just.*, 80 F.4th 717, 723 (5th Cir. 2023)).

Additionally, where health risks posed by a plaintiff's lack of vaccination *have* constituted undue hardship, the employer's concern tended to regard the risk posed to the *employer's other employees or their own patients*, not the employees or patients of third parties. *See Villareal*, 2022 WL 17092090, at *7 (healthcare professionals in nursing home with older adults and individuals with underlying medical conditions who "represented a significant portion of Rocky Knoll's resident population"); *MacDonald*, 2024 WL 3316199, at *12 ("[A]n unvaccinated nurse . . . would put other staff members and a vulnerable patient population at risk."); *Adams*, 2023 WL 6318821, at *7 (patients were concerned about defendant's COVID policies). In this case, AstraZeneca only points to the health risks posed to physicians and their vulnerable patients and does not provide evidence that its own employees would be affected.[41] (Doc. No. 39 at PageID# 946, 963.) The record instead demonstrates that Bobnar's trips to customers' facilities would typically be done alone, and not with any other AstraZeneca employee. (Wood. Dep. at Tr. 17–18.) AstraZeneca accordingly cannot rely on unsupported third-party health and safety risks to demonstrate an undue hardship to itself.

AstraZeneca lastly insists that Bobnar's exposure to vulnerable COVID-19 patients would "risk[] significant damage to [its] reputation as a global pharmaceutical company that manufactures vaccines" based on Bobnar's testimony that he was an "ambassador" and "representative" of AstraZeneca. (Doc. No. 39 at PageID# 963 (citing *Adams*, 2023 WL 6318821); Bobnar Dep. at Tr. 184, 186).) The Court rejects this argument for two reasons. First, even assuming *arguendo* that

---

[41] Even if AstraZeneca could demonstrate some increased risk to its own employees caused by granting Bobnar's accommodation request, that alone, without further analysis of whether such risks would affect the conduct of the business, would not be enough to unduly burden AstraZeneca. *See Hayslett v. Tyson Foods, Inc.*, 2023 WL 118897503, at *13 (E.D. Tenn. Sept. 20, 2023) (rejecting argument that "Plaintiff's presence would have put other vaccinated employees at risk" because even accepting that claim as true, "*Groff* made clear that adverse impact on other employees, standing alone, does not satisfy the undue burden test"); *Groff*, 600 U.S. at 472 ("[N]ot all impacts on coworkers are relevant, but only coworker impacts that go on to affect the conduct of the business.") (internal quotation marks omitted).

Bobnar's exposure as an unvaccinated AstraZeneca employee to physicians, and even to patients, would pose a cognizable health and/or safety risk of contracting COVID-19, AstraZeneca does not provide or cite to any evidence of potential damage to its reputation.  Bobnar's testimony that he was an AstraZeneca "ambassador" or "representative" alone does not demonstrate that AstraZeneca would have experienced any reputational harm if he remained unvaccinated.  The record instead demonstrates that nobody ever asked Bobnar about his vaccination status, and that even if a customer did, he would not have been required to disclose it.  (Bobnar Dep. at Tr. 259; Wood Dep. Ex. A.) Indeed, Bobnar and Wood already had COVID-19 before the Mandate, and there is no suggestion that any customer or their patient knew about these infections, let alone that they harmed AstraZeneca's reputation.

Likewise, Bobnar's job entailed attending speaker programs at which a specialist would speak about a "disease state" or an AstraZeneca product.  (Bobnar Dep. at Tr. 180.)  Wood, while perhaps not on the "front line," would still "work[] with the speakers" in this regard and served the same customers as Bobnar.  (*Id.* at Tr. 188; Wood Dep. at Tr. 22–24.)  Given Bobnar's weekly PCR testing, which as noted was deemed sufficient for Wood despite his own interactions with customers, (Wood Dep. at Tr. 24 (Wood explaining he would "sometimes" attend dinner programs with Bobnar)), it is difficult to conclude how or whether any spread of COVID-19 could be traced back to Bobnar specifically so as to damage AstraZeneca's reputation.  *See Cox v. Gray Media Group, Inc.*, 2024 WL 1403074, at *5 (E.D. Ky. Apr. 1, 2024) ("[W]hether [Employer] accommodated employees with similar job duties is probative to whether [Employee's] requested accommodations imposed an undue burden on [Employer].");  *Barton v. Metro. Gov't of Nashville and Davidson Cty.*, 2022 WL 989100,

49

at *3 (M.D. Tenn. Mar. 31, 2022) (considering other employees' time off when evaluating whether plaintiff's requested accommodation for time off due to religious beliefs was an undue hardship).

Second, as a self-described "global pharmaceutical company," there is no evidence that, for example, AstraZeneca is a healthcare provider or that its mission or objective would otherwise be harmed if one of its representatives was unvaccinated. (Doc. No. 36-1 at PageID# 756.) *Cf. MacDonald*, 2024 WL 3316199, at *7–8, *11–12 (undue hardship where "allowing staff and patients to be put at risk compromised Defendant's mission to serve the community and keep it safe[, so] allowing Plaintiff to continue as a nurse in the [Mother Baby Unit] without vaccination would unduly burden Defendant's mission and, by extension, the conduct of its particular business"); *Bushra v. Main Line Health, Inc.*, 709 F. Supp. 3d 164, 175 (E.D. Pa. 2023) ("The ability of MLH to continue its mission of caring for, treating, and healing the sick and injured would have been severely impaired with an unvaccinated Dr. Bushra in its midst."). AstraZeneca does not even reference its mission in its pleadings, let alone explain how such mission would be impeded by accommodating Bobnar.[42] AstraZeneca cannot rely on speculative or hypothetical argument to demonstrate an undue hardship. *See Hebrew v. Tex. Dep't of Crim. Just.*, 80 F.4th 717, 723 (5th Cir. 2023).

AstraZeneca has failed to demonstrate a genuine issue of material fact that accommodating Bobnar would have caused an undue hardship. Accordingly, the Court **GRANTS** summary judgment in Bobnar's favor on his religious discrimination/failure to accommodate claim (Count One).

---

[42] *Cf. Bushra*, 709 F. Supp. 3d at 175 (expressly referencing employer's mission of "caring for, treating, and healing the sick"); *MacDonald*, 2024 WL 3316199, at *8, 11–12 (providing in-depth discussion employer's public mission statement when evaluating undue hardship). Moreover, the Court finds Bobnar's role as a sales representative to be distinguishable from healthcare provider cases where, for example, an employee "had frequent and direct contact with patients and staff as a doctor in the emergency room" or was a "registered nurse in the Mother Baby Unit." *Bushra*, 709 F. Supp. 3d at 175; *MacDonald*, 2024 WL 3316199, at *1.

50

**B.**     **Religious Discrimination/Retaliation in Violation of O.R.C. Chapter 4112 and Title VII (Count Two)**

In Count Two, Bobnar alleges that AstraZeneca unlawfully retaliated against him in violation of Chapter 4112 of the Ohio Revised Code and Title VII of the Civil Rights Act of 1964 when it denied his Request, terminated his employment, withheld and refused to give him bonus payments under the FSIP, and attempted to modify the terms of the FSIP.  (Doc. No. 1 at ¶¶ 62–74.)

Title VII provides that it is unlawful for an employer "to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  An "unlawful employment practice" under Title VII includes any actions taken "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1).

A plaintiff in a Title VII action "may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation."  *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 543 (6th Cir. 2008).  In this case, Bobnar does not rely on any direct evidence of retaliation.  Therefore, to succeed on his retaliation claim, Bobnar must establish a *prima facie* case of retaliation under the *McDonnell-Douglas* framework.  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).[43]

---

[43] Title VII retaliation and Ohio state-law retaliation claims are evaluated under the same *McDonnell-Douglas* framework. *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 544 (6th Cir. 2008); *Veal v. Upreach LLC*, 2011-Ohio-5406, at ¶16 (Ohio

51

Under *McDonnell-Douglas*, a plaintiff must first demonstrate that "(1) he engaged in activity protected under Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citation omitted).  Once the plaintiff has successfully established a *prima facie* case, the burden shifts to the defendant, who must then show that it had a "legitimate, nondiscriminatory reason" for terminating him.  *Render*, 53 F.4th at 920 (quoting *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 573 (6th Cir. 2021)).  If the defendant does so, the burden shifts back to the plaintiff "to show that [the defendant's] given reason was pretextual." *Id.*

In its Motion for Summary Judgment, AstraZeneca contends that the record does not contain any evidence to support Bobnar's claim that AstraZeneca terminated his employment and refused to pay him his Q1 2022 bonus because he sought a religious accommodation.  (Doc. No. 36-1 at PageID# 774.)  In support of this contention, AstraZeneca proffers four arguments: (1) "merely requesting a religious accommodation" is not a protected activity under Title VII; (2) Bobnar cannot proffer sufficient evidence of causation between his Request and AstraZeneca's decision to terminate his employment or "enforce the FSIP eligibility requirements"; (3) Bobnar cannot cite to evidence that AstraZeneca treated differently from similarly situated employees who did not request an accommodation; and (4) Bobnar has failed to demonstrate a genuine issue of fact that AstraZeneca's

---

App. 10th Dist. 2011) ("Absent direct evidence . . . Ohio courts analyze retaliation claims using the evidentiary framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792[] . . . .").

reasons for terminating his employment or not providing him a Q1 2022 bonus were pretextual. (*Id.* at PageID# 774–76.)

In response, Bobnar argues that his texts with Wood and his April 27 letter to AstraZeneca's management constituted a complaint, and that this complaint, as well as his consulting with an attorney about alleged discrimination, were protected activities. (Doc. No. 37 at PageID# 923–24.) Bobnar further explains that the denial of his Request within after "reporting his discrimination and harassment complaints to Wood," his plan to consult an attorney, and his April 27 letter (after which his termination "was finalized") are temporal proximity evidence of causation. (*Id.* at PageID# 924.) Bobnar next contends that Wood is a comparator who did not complain to management about discrimination but was granted a religious exemption. (*Id.* at PageID# 924–925.) Bobnar also insists that AstraZeneca's failure to follow its EEO Policy is evidence of pretext, and suggests that attempt to "strong-arm him" by offering to pay the Q1 2022[44] bonus only if he resigned and executed a release was also pretextual. (*Id.* at PageID# 925–27.)

In reply, AstraZeneca counters that Bobnar admitted in his Motion for Partial Summary Judgment that AstraZeneca terminated his employment due to his failure to comply with the Mandate, and that AstraZeneca nevertheless did not know about Bobnar's complaint to Wood because Wood did not inform AstraZeneca or Nichols of Bobnar's alleged complaint. (Doc. No. 41 at PageID# 1142–43.) Further, AstraZeneca asserts that temporal proximity evidence alone is insufficient for causation, and maintains that there is no evidence that Wood engaged in protected activity. (*Id.* at

---

[44] In his Complaint, Bobnar states that AstraZeneca withheld his "2021 Q1 bonus." (Doc. No. 1 at ¶ 69.) In his Motion for Partial Summary Judgment, however, Bobnar instead refers to AstraZeneca's failure to pay his bonus for Q1 of 2022. (Doc. No. 33-1 at PageID# 317.) AstraZeneca does not dispute that the correct bonus at issue is Bobnar's Q1 2022 bonus. (*See* Doc. No. 36-1 at PageID# 778–79.) Accordingly, the Court will consider Bobnar's Q1 2022 bonus to be the disputed bonus.

PageID# 1143–44.)  AstraZeneca lastly insists that Bobnar has not responded to its argument that he has failed to show a genuine issue of fact that the reasons for his termination and denial of a Q1 bonus were pretextual.  (*Id.* at PageID# 1144–45.)

As discussed above, the Court has already concluded that, for purposes of the Title VII analysis, that Wood is a proper comparator for Bobnar.  And the parties do not dispute that Bobnar's termination or the withholding of an earned bonus constitutes an adverse employment action.  Thus, the remaining disputes concerning Bobnar's *prima facie* case are whether (1) Bobnar complained to AstraZeneca or its management (i.e. whether there was a protected activity known to AstraZeneca) and whether (2) Bobnar's termination was causally connected to Bobnar's alleged complaints.

For the following reasons, the Court concludes that Bobnar has failed to establish a *prima facie* case of retaliation under Title VII.

### 1.    Known Protected Activity

Beginning with the first element, Title VII "clearly delineates two options" for a "protected activity": "opposition to discrimination practice" and "participation in an investigation."  *Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 358 (6th Cir. 2020) (citing 42 U.S.C. § 2000e-3(a)).  Only the former option is relevant in this case.  To receive protection under Title VII's anti-retaliation provision, a plaintiff must oppose acts that he believes are Title VII violations.  *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012).

The Court concludes that there is no genuine dispute of material fact as to whether Bobnar engaged in protected activity that AstraZeneca was aware of when Bobnar was terminated.  Bobnar's

claimed protected activities are the filing of his Request, his texts with Wood,[45] and Bobnar's April 27 letter.  The Court will address each activity, in turn, below.

As to his Request, despite alleging in his Complaint that requesting a seeking a religious accommodation was a protected activity, Bobnar does not expressly address AstraZeneca's argument in his Opposition to AstraZeneca's Motion for Summary Judgment.  (Doc. No. 1 at ¶ 63; *see generally* Doc. No. 37.)[46]  The Sixth Circuit has held that "[a] request for an accommodation does not constitute protected activity under Title VII."  *Stanley v. ExpressJet Airlines, Inc.*, 808 F. App'x 351, 358 (6th Cir. 2020).[47]   In light of the Sixth Circuit's clear guidance on the issue, the Court concludes that Bobnar's Request, in seeking a religious accommodation, was not a protected activity under Title VII.  *See Bass*, 2024 WL 1315843, at *10 (concluding that requesting religious accommodation was

---

[45] AstraZeneca does not appear to address Bobnar's argument that consulting with an attorney is a protected activity.  (*See* Doc. No. 37 at PageID# 923.)  The Court acknowledges that "[c]onsulting with an attorney is recognized as a protected activity for purposes of . . . federal anti-retaliation statutes."  *Queen v. Park Nat'l Bank*, 2010 WL 11639834, at *6 (S.D. Ohio Mar. 10, 2010); *see also El-Zabet v. Nissan N. Am., Inc.*, 211 F. App'x 460, n.1 (6th Cir. 2006) (contemplating without deciding that an employee's "request for an attorney [to speak for him to prevent future national origin harassment] might qualify as protected opposition").  Nevertheless, as with Bobnar's other texts to Wood concerning harassment and discrimination, because the record demonstrates that Wood did not inform AstraZeneca's decisionmakers of Bobnar's texts, Bobnar has not shown that there is a genuine dispute of material fact as to whether AstraZeneca knew of Bobnar's consultation with an attorney, and therefore, Bobnar cannot rely on his texts with Wood to substantiate a *prima facie* case.

[46] Bobnar implies that Wood, who requested a religious accommodation from AstraZeneca, did not engage in protected activity.  (Doc. No. 37 at PageID# 925.)  Because Bobnar's Complaint indicates that Bobnar considered his Request to be a protected activity, the Court will address whether Bobnar's Request indeed constitutes a protected Title VII activity.

[47] The Court is aware of apparently conflicting language from an earlier Sixth Circuit case, *Creusere v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*, 88 F. App'x 813 (6th Cir. 2003).  In *Creusere*, a Title VII retaliation case, the Sixth Circuit, in a single sentence and without analysis, concluded that the plaintiff "was clearly engaged in a protected activity by requesting religious accommodation."  *Id.* at 821.  In *Stanley*, however, a much more recent case, the Sixth Circuit there assessed and cited Title VII's text and held that requesting a religious accommodation does not constitute protected activity under Title VII.  *Stanley*, 808 F. App'x at 358.  Accordingly, the Court finds *Stanley* more persuasive.  *Cf. Garzynski v. Accident Fund Ins. Co.*, 2023 WL 3437294, at *3 (E.D. Mich. May 12, 2023) (determining that *Creusere* was unpersuasive in light of *Stanley* regarding whether requesting an accommodation constituted a protected activity).

not a protected activity under Title VII); *Garczynski v. Accident Fund Ins. Co.*, 2023 WL 3437294, at *2 (E.D. Mich. May 12, 2023) (same).

Next, the Court considers whether Bobnar's "complaints," to include his texts with Wood about "harassment" and "discrimination" and the April 27 letter, constitute a protected activity. As noted above, the term "protected activity" encompasses opposition to an unlawful practice. *Stanley*, 808 F. App'x at 358. Title VII's opposition clause makes it "unlawful . . . for an employer to discriminate against any of his employees . . . because he has opposed any practice made . . . unlawful . . . by this [title.]" 42 U.S.C. § 2000e-3. According to the Supreme Court, "the term 'oppose' should be interpreted based on its ordinary meaning: '[t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand.'" *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021) (quoting *Crawford v. Metro. Gov't of Nashville & Davison Cnty.*, 555 U.S. 271, 276 (2009)). "Examples of opposition activity protected under Title VII include 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; [and] refusing to obey an order because the worker thinks it is unlawful under Title VII.'" *Id.* at 344–45 (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)); *see also Jenkins v. Regents of Univ. of Mich. Health Sys.*, 763 F. App'x 545, 552 (6th Cir. 2019)). While a plaintiff is not required to lodge a complaint "with absolute formality, clarity, or precision," "general 'complaints to management' do not constitute protected activity when the plaintiff does not 'object to discriminatory conduct against her based on her membership in a protected class.'" *Jenkins*, 763 F. App'x at 552 (quoting *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 511 (6th Cir. 2016)) (cleaned up). Under these authorities, the Court finds that Bobnar's texts to Wood about the Mandate

and the alleged "harassment" and "discrimination" and his April 27 letter mentioning the Mandate's purported discrimination constitute protected opposition.

However, the Court concludes that AstraZeneca lacked sufficient knowledge of Bobnar's protected opposition. To prove a claim for retaliation under Title VII, the plaintiff must "establish that the individuals charged with taking the adverse employment action knew of the protected activity." *Mulhall v. Ashcroft*, 287 F.3 543, 552 (6th Cir. 2002); *see also Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999) ("[Plaintiff] has not met her burden of showing that her protected activity was known to those who made that decision."). "Where the decisionmaker denies having knowledge of the alleged protected activity, the plaintiff must do more than 'offer only conspiratorial theories . . . or 'flights of fancy, speculations, hunches, intuitions, or rumors.'" *Proffitt v. Metropolitan Government of Nashville and Davidson Cty, Tenn.*, 150 F. App'x 439, 443 (6th Cir. 2005) (quoting *Mulhall*, 287 F.3d at 552) (alteration omitted); *Price v. Warrensville Heights City Schools*, 2012 WL 7829135, at *12 (N.D. Ohio May 3, 2012).

Here, although there is evidence that Bobnar informed Wood of his thoughts that the Mandate was "harassment" and "discrimination," Wood himself was not a decisionmaker—Wood did not have a role in granting or denying the accommodation requests. (Nichols Dep. at Tr. 79; Wood Dep. at Tr. 60–61.) Instead, that responsibility belonged to Nichols and his team, and Wood did not share Bobnar's complaints with AstraZeneca's management.[48] (Wood Dep. at Tr. 73; Nichols Dep. at Tr.

---

[48] *See Cain v. Potter*, 2006 WL 3146435, at *5 (N.D. Ohio Oct. 31, 2006). In *Cain*, the plaintiff attempted to infer that his supervisor possessed knowledge of his protected activity because the supervisor's superiors and co-workers allegedly possessed that knowledge and must have passed it on. *Id.* The court rejected this argument and noted that it was "not a permissible inference as to the element of knowledge" for a Title VII retaliation claim simply because other employees were aware of the protected activity. *Id.* The court explained that it was the decisionmaker—the "individual who actually took the adverse action"—who must be shown to have had knowledge of the protected activity. *Id.* Thus, without any evidence to the contrary, the court was "left with the [decisionmaker's] sworn statement denying prior knowledge" and the plaintiff's "attempt to rebut that statement with conspiratorial theories." *Id.* (internal quotation marks omitted). Summary judgment for the employer was granted because no reasonable jury, without additional evidence, could find

79.)  Nichols did not speak with Wood concerning the consideration of Bobnar's Request, saying that he did not "feel it was necessary."  (Nichols Dep. at Tr. 79.)  And as for his April 27 letter, Bobnar only indicates that he sent the letter to "management," and not to Nichols or another AstraZeneca decisionmaker.  (Bobnar Decl. at ¶ 3.)  Further, AstraZeneca had notified Bobnar on March 31, 2022 or nearly four weeks before he purportedly sent his letter, that he would be terminated by April 29, 2022, if he did not receive the vaccine.  (Bobnar Dep. Ex. 28 at PageID# 1557.)  The record therefore suggests that AstraZeneca lacked knowledge that Bobnar engaged in protected activity before AstraZeneca decided to terminate him.  AstraZeneca has met its burden of demonstrating an absence of an issue of fact.

Because AstraZeneca has discharged its initial summary judgment burden, the burden shifts to Bobnar, as the non-moving party, to set forth "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted).  Bobnar does not point to any record evidence demonstrating that Wood communicated Bobnar's complaints to Nichols or AstraZeneca's other decisionmakers, or that he otherwise complained to AstraZeneca's decisionmakers before AstraZeneca made the decision to fire him and informed him thereof.[49]  Instead, Bobnar relies on an unsupported assertion that he complained, and

---

that the decisionmaker-supervisor had knowledge of plaintiff's protected activity.  *Id.*  Other courts within this Circuit have reached the same conclusion on similar facts.  *See, e.g.*, *Mulhall*, 287 F.3d at 552; *Fenton*, 174 F.3d at 832; *Profitt*, 150 F. App'x at 443; *Rembert v. Swagelok Co.*, 2023 WL 3094546, at *4–5 (6th Cir. Apr. 26, 2023); *Evans v. Professional Transp., Inc.*, 614 F. App'x. 297, 302 (6th Cir. 2015); *Frazier v. USF Holland, Inc.*, 250 F. App'x. 142, 148 (6th Cir. 2007); *Bruce v. Meharry Medical College*, 692 F. App'x 275, 279 (6th Cir. 2017); *Crane v. Mary Free Bed Rehabilitation Hosp.*, 634 F. App'x 518, 526–27 (6th Cir. 2015); *Tracy v. Northrop Grumman Systems Corp.*, 2011 WL 6965839, at *2 (6th Cir. Dec. 21, 2012); *Taylor v. Wal-Mart Stores, Inc.*, 2021 WL 7368671, at *4 (6th Cir. Nov. 10, 2021); *Dulaney v. Flex Films (USA), Inc.*, 2021 WL 3719358, at *7 (6th Cir. Aug. 23, 2021); *Newton v. Meijer Stores Ltd. Partnership*, 347 F. Supp. 2d 516, 524–25 (N.D. Ohio Dec. 8, 2004); *Johnson v. Aston Carter, Inc.*, 2024 WL 1317777, at *8 (E.D. Mich. Mar. 27, 2024).

[49] *See supra* note 48; *see also Hayes v. McCroskey*, 2020 U.S. App. LEXIS 17057, at *10–11 (6th Cir. May 28, 2020) (affirming grant of summary judgment to employer where plaintiff failed to point to record "evidence demonstrating that he either complained of race discrimination [to employer's management], or that management should have known that

therefore AstraZeneca, and in particular Nichols as primary decisionmaker, knew.  Even when construing the evidence in Bobnar's favor, this is insufficient to demonstrate a genuine issue of fact as to whether AstraZeneca's decisionmakers knew of his protected activities.  *See Proffitt v. Metro. Gov't of Nashville & Davidson Cnty.*, 150 F. App'x 439, 442–43 (6th Cir. 2005) (plaintiff's evidence "too speculative" when based on inferences failed to rebut supervisor's testimony that she did not have knowledge of plaintiff's participation in investigation).  Accordingly, Bobnar has not met his burden of showing a genuine issue of material fact exists to demonstrate a *prima facie* case of retaliation under Title VII.

## 2.    **Causal Connection**

Even if requesting an accommodation were a protected activity, and Bobnar had met his burden in demonstrating that AstraZeneca knew of both his Request and his complaints prior to his termination, Bobnar still fails to demonstrate an issue of fact as to whether a causal connection exists between these activities and his termination and/or AstraZeneca's refusal to pay his Q1 2022 bonus.

In the retaliation context, a causal connection between an employer's actions and a protected activity is established when the protected activity was the "but-for" cause of the alleged adverse action by the employer.  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  "But-for" causation means that the plaintiff must furnish evidence that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.*; *see also Lisan*, 835 F. App'x at 835; *Seoane-Vazquez v. Ohio State University*, 577 F. App'x 418, 428 (6th Cir. 2014).  Whether a protected activity was the but-for cause of an employee's termination is a

---

he was complaining about race discrimination prior to his termination"); *Johnson v. Evolent Health*, 2023 WL 2326676, at *5 (6th Cir. Mar. 2, 2023) (finding no knowledge or awareness of pregnancy where plaintiff's coworkers testified they did not share news with anyone).

context-specific inquiry. *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007)).

In his Opposition to AstraZeneca's Motion for Summary Judgment, Bobnar relies on temporal proximity to demonstrate causation, arguing that AstraZeneca denied his Request "five weeks" after texting Wood and "finalized" his termination "two days" after sending his April 27 letter. (Doc. No. 37 at PageID# 924.)

Whether temporal proximity in the retaliation context can, on its own, demonstrate causation, has at times been unclear in the Sixth Circuit. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523–25 (6th Cir. 2008) (collecting cases).[50] Even assuming *arguendo* that temporal proximity alone could establish causation, the Court still concludes that Bobnar has not shown that his protected activity led to any adverse employment action. The Sixth Circuit has held that "temporal proximity is not evidence of causation if the employer, in taking the adverse action, 'merely proceeded along lines previously contemplated.'" *DeNoma v. Hamilton Cty. Ct. of Common Pleas*, 626 F. App'x 101, 111 (6th Cir. 2015) (alterations omitted); *see also Tharp v. Apel International, LLC*, 2022 WL 2981770, at *3 (6th Cir. July 28, 2022). Rather, "temporal proximity is only evidence of causation if the adverse

---

[50] District courts have also encountered this issue. *See Eppes v. Enter. Rent-A-Car Co.*, 2007 WL 1170741, at *7 (E.D. Tenn. Apr. 18, 2007) (observing that there is "some confusion in the case law on this issue"); *Minevich v. Spectrum Health-Meier Heart Ctr.*, 1 F. Supp. 3d 790, 804 (W.D. Mich. 2014) ("Acknowledging the intra-Sixth Circuit split on this issue, evidence demonstrating that he either complained of race discrimination to anybody within Johnston Enterprises' management, or that management should have known that he was complaining about race discrimination prior to his termination."). In particular, one line of cases suggests that, generally, "temporal proximity alone may not establish a causal connection." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (collecting cases); *Kenney*, 965 F.3d at 449 (noting that "[e]xceptions to this rule are 'rare,' even in instances involving relatively short time periods"); *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 430 (6th Cir. 2021) ("[T]he majority suggests that the temporal proximity between Wyatt rebuffing Mullen's advances and her removal from the project one month later suffices. Our cases undercut that view, holding that temporal proximity alone generally cannot establish causation.") (Cook, J., dissenting). Another line of cases has since concluded "that in some circumstances temporal proximity alone would be sufficient." *Mickey*, 516 F.3d at 524 (citation omitted) (collecting cases); *Wyatt*, 999 F.3d at 421 (adverse employment action occurring "within weeks, if not days, of [plaintiff's] protected activity" was "sufficient temporal proximity").

[51] employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out." *Id.* (internal quotation marks omitted); *see also Tharp*, 2022 WL 2981770, at *3.

In this case, even when viewing all inferences in Bobnar's favor, the record evidence demonstrates that, on January 31, 2022, AstraZeneca notified Bobnar that failure to obtain either an exemption to the Mandate or a COVID vaccine would potentially result in his termination. (Nichols Dep. Ex. K at PageID# 576.) After Bobnar's Request was denied, AstraZeneca, on March 31, 2022, then notified him that, due to his failure to obtain either an exemption or a vaccine, he would be terminated on April 29, 2022. (Bobnar Dep. Ex. 28.) Although Bobnar's Request and first "complaint" to Wood were made within 5 weeks of AstraZeneca's decision to terminate Bobnar, AstraZeneca had already determined that termination would be on the table and a real possibility for employees who failed to comply with the Mandate, which for unvaccinated employees would require the obtaining of an exemption. (Nichols Dep. Ex. K; Bobnar Dep. Ex. 28.) In other words, "[t]he wheels . . . were clearly in motion" as of January 31, 2022, "for the potential termination of [Bobnar's] employment" in the event that Bobnar, as an unvaccinated employee, failed to receive or obtain an exemption. *Carpenter v. Kaiser Permanente*, 2006 WL 2794787, at *18 (N.D. Ohio Sept. 27, 2006) (summary judgment granted on FMLA retaliation claim where plaintiff's evidence showed a "coincidence in timing" and "not a meaningful close temporal proximity" between FMLA leave and

---

[51] As AstraZeneca argues, Bobnar appears to concede that he was fired "with cause, for refusing to take the vaccine." (Doc. No. 33-1 at PageID# 315; *see* Doc. No. 41 at PageID# 1142–43.) This concession is in apparent conflict with Bobnar's position elsewhere throughout his briefings related to the pending summary judgment motions. (*See, e.g.* Doc. No. 37 at PageID# 926.) The Court proceeds in its analysis under the presumption that Bobnar has not *conceded* that the cause of his termination was for failure to comply with the Mandate.

discharge).[52]  And if, as the FSIP suggests, a termination "for cause," such as for failure to abide by the Mandate, could preclude Bobnar's entitlement to the Q1 2022 bonus, in effect, this outcome was also already on the table when Bobnar's Request was denied and he refused to receive the vaccine. (Nichols Decl. Ex. 1 at PageID# 1104.)

Bobnar does not point to or cite any evidence that would suggest that AstraZeneca did not intend to fire employees who failed to comply with the Mandate prior to his complaint to Wood, or that, for example, AstraZeneca preferred other alternatives to termination for non-compliant employees but decided to terminate Bobnar if he failed to comply once he complained.  The mere fact that AstraZeneca "finalized"[53] its decision to terminate him two days after he sent the April 27 letter to AstraZeneca's "senior management" is inconsequential, as AstraZeneca had already indicated to Bobnar on March 31, 2022, that he would be fired if he failed to comply with the Mandate.[54]  Thus, no reasonable jury could conclude that, but for Bobnar's complaints to Wood and AstraZeneca's "senior management," he would not have been terminated in April 2022.  *See Sumner v. Beaumont Health Sys.*, 2022 WL 1322850, at *17 (E.D. Mich. May 3, 2022) (finding that email suggesting plaintiff's need for improvement in performance that was sent 11 days before plaintiff

---

[52] *See also Tracy v. Northrop Grumman Systems Corp.*, 2010 WL 11639693, at *4 (S.D. Ohio July 9, 2010) ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."); *Grubb v. YSK Corp.*, 2009 WL 3150344, at *8 (S.D. Ohio Sept. 30, 2009) (same).

[53] Whether AstraZeneca "finalized" its decision on the day Bobnar was fired is unclear.  The evidence before the Court suggests that, instead, AstraZeneca had already determined on March 31, 2022, that it would be terminating Bobnar's employment on April 29, 2022, unless he received a COVID-19 vaccine.  (Bobnar Dep. Ex. 28.)  There is no suggestion or indication here that AstraZeneca left any possibility of retaining Bobnar despite his vaccination status after March 31, 2022, up to or until April 29, 2022.  *See Carter Arbors East, Inc.*, 2011 WL 1641153, at *10 (S.D. Ohio May 2, 2011) ("[I]t was impossible for Arbors management to have discharged Plaintiff on the basis of her FMLA request because the request was made after Arbors management finalized its decision to terminate her employment.").

[54] Although the Court finds AstraZeneca's denial of Bobnar's Request and subsequent termination to be unlawfully discriminatory, the point remains that it was not Bobnar's *complaints* that were the cause of his termination.

verbally reported her race discrimination complaint indicated that her performance improvement plan "could not have been retaliatory").

Lastly, while Bobnar has introduced evidence that Wood conditioned his Q1 2022 bonus on Bobnar resigning and signing a release, Bobnar has failed to point to any evidence that AstraZeneca did so to "strong-arm" him because of his complaints or because he requested an accommodation. (Doc. No. 37 at PageID# 926–27.)  Bobnar has therefore not met his burden of demonstrating a genuine factual dispute exists as to whether either AstraZeneca knew of his protected activities, or whether there was a causal connection between any protected activity and his termination. Accordingly, the Court grants summary judgment in AstraZeneca's favor on Bobnar's Title VII retaliation claim (Count Two).[55]

### C.    Family and Medical Leave Act Claims (Count Four)

In Count Four, Bobnar alleges that AstraZeneca "unlawfully restrained, denied, and interfered with his substantive FMLA rights" when it terminated his employment and contacted him during his job-protected paternity leave.  (Doc. No. 1 at ¶¶ 40, 80–83.)

The FMLA, codified at 29 U.S.C. § 2601 *et seq.*, "guarantees 'eligible employees' twelve weeks of unpaid leave during any twelve-month period for certain family or medical events, including childbirth." *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 629 (6th Cir. 2008) (citing 29 U.S.C. § 2612(a)(1)).  If an employee is approved for a period of FMLA leave, then the employer must

---

[55] Because the Court concludes that Bobnar has not demonstrated that a genuine issue of fact exists as to whether AstraZeneca's management knew of his protected activities or that his activities resulted in his termination, and has therefore failed to show an issue of fact with respect to his *prima facie* case, the Court does not need to address Bobnar's argument concerning pretext (i.e. that AstraZeneca failed to follow its own EEO Policy) or AstraZeneca's argument that it had a legitimate reason for his termination other than his Request.  (Doc. No. 37 at PageID# 925; Doc. No. 41 at PageID# 1144–45.)

"restore[] . . . the employee to the position of employment held by the employee when the leave commenced' and the period of FMLA leave 'shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Snyder v. U.S. Bank Nat'l Ass'n*, 2022 WL 17330172, at *2 (6th Cir. Nov. 29, 2022) (quoting 29 U.S.C. § 2614(a)(1)(A)); *Kinds v. Ohio Bell Telephone Co.*, 724 F.3d 648, 652 (6th Cir. 2013) (quoting 29 U.S.C. § 2614(a)(2)).  "But the FMLA does not entitle an employee to any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *Snyder*, 2022 WL 17330172, at *2 (quoting 29 U.S.C. § 2614(a)(3)(B)) (internal quotation marks omitted).

The FMLA prohibits qualifying employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise any right provided" by the FMLA.  *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577 (6th Cir. 2007) (citing 29 U.S.C. § 2615(a)(1)).  An employer also cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."  29 U.S.C. § 2615(a)(1)–(2).  The Sixth Circuit "recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Blank v. Nationwide Corp.*, 2021 WL 3469187, at *5 (6th Cir. Aug. 6, 2021).  In his Opposition to AstraZeneca's Motion for Summary Judgment, Bobnar only raises the interference theory.  (Doc. No. 37 at PageID# 927–28.)  However, in his Complaint, Bobnar appears to also allege that he was retaliated against for using FMLA leave when AstraZeneca fired him.  (Doc. No. 1 at ¶ 81.)  Therefore, the Court will address both theories.

### 1.      FMLA Interference

To state a claim for FMLA interference, a plaintiff must allege:

(1) []he was an eligible employee, (2) the [defendant] was a covered employer, (3) []he was entitled to take leave, (4) []he gave the [defendant] notice of [his] intent to take leave, and (5) the [defendant] denied [his] FMLA benefits or interfered with [his] FMLA rights.

*Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 631 (6th Cir. 2018); *see also Hrdlicka v. GM LLC*, 63 F.4th 555, 572 (6th Cir. 2023) (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012)). In this case, AstraZeneca only disputes whether Bobnar can establish the fifth element, that AstraZeneca denied his FMLA benefits or otherwise interfered with his FMLA rights.  (Doc. No. 36-1 at PageID# 776–78; Doc. No. 37 at PageID# 927–28.)

To establish FMLA interference, i.e. that the employer "has denied the employee a benefit to which he is entitled," a plaintiff must demonstrate that the employer took an adverse employment action against him "based, in whole or in part, on the fact that the employee took FMLA-protected leave."  *Donald*, 667 F.3d at 761 (citation omitted); *see Mullendore v. City of Belding*, 872 F.3d 322, 329 (6th Cir. 2017) ("The problem with Mullendore's theory of her case is that it equates a termination in her absence with a termination because she was absent on FMLA-qualifying medical leave. The former is permissible, even when an employee is on medical leave; the latter is not permissible.").  Bobnar contends or alleges that AstraZeneca interfered with his FMLA leave by (1) terminating him and (2) contacting him.  (Doc. No. 1 at ¶ 81; Doc. No. 37 at PageID# 927.)  Thus, the "operative question" in this case is whether Bobnar was terminated or contacted because he went on FMLA leave.  *See Hodnett v. Chardam Gear Co.*, 2017 WL 6621527, at *13 (E.D. Mich. Dec. 28, 2017), *aff'd*, 749 F. App'x 390 (6th Cir. 2018) (citing *Mullendore*, 872 F.3d at 328).

In its Motion for Summary Judgment, AstraZeneca contends that it did not interfere with Bobnar's FMLA rights for two reasons.  (Doc. No. 36-1 at PageID# 776.)  First, AstraZeneca argues

65

that Bobnar's Request was denied before he commenced FMLA leave, and therefore that he was already going to be terminated when he started his leave, so his termination did not relate to it. (*Id.* at PageID# 776–77.) Second, AstraZeneca insists that its "*de minimis* contacts" with Bobnar do not substantiate a "material" interference under the FMLA as a matter of law. (*Id.* at PageID# 776–78.)

Bobnar responds by suggesting that he was "required to" conduct conferences, meetings, and perform other work-related tasks while on his leave for a total of 10 hours. (Doc. No. 37 at PageID# 927.) According to Bobnar, these contacts and "substantive" tasks create a genuine issue of material fact as to whether AstraZeneca's interference was unlawful. (*Id.* at PageID# 928.)

In reply, AstraZeneca claims that Bobnar does not address its explanation that "his termination did not constitute FMLA interference" and that he therefore waived any argument to the contrary. (Doc. No. 41 at PageID# 1145, 1147.) AstraZeneca further contends that Bobnar does not provide details as to his tasks or work performed while on leave, and that his interactions with AstraZeneca were limited to off boarding and voluntary discussions with coworkers and about transitioning responsibilities, which are insufficient to demonstrate FMLA interference. (*Id.* at PageID# 1145–47.)

Beginning with Bobnar's termination, the Court concludes that Bobnar has not demonstrated a causal connection between it and his FMLA leave. It is undisputed that, as of March 31, 2022, AstraZeneca was going to terminate Bobnar on April 29, 2022, unless he received the COVID vaccine by April 22, 2022, and that Bobnar's FMLA leave did not begin until April 13, 2022. (Bobnar Dep. Exs. 28, 31.) Although AstraZeneca did not "finalize" Bobnar's termination until after he went on FMLA leave, because Bobnar refused to take the vaccine by April 22, 2022, the "'wheels of termination' had already been put into motion" for Bobnar's termination by the time he began his

FMLA leave.  *See Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 557 (6th Cir. 2010) (quoting *Kennebrew v. N.Y.C. Hous. Auth.*, 2002 WL 265120, at *20 (S.D.N.Y. Feb. 26, 2002)) (no causation in FMLA retaliation claim where plaintiff was insubordinate prior to engaging in protected activity).  Thus, no reasonable jury could find that there was a causal connection between Bobnar taking FMLA leave and his termination.  *See id.* ("[A]n employee may not insulate himself from a pending dismissal by opportunistically invoking the FMLA.").  The evidence also suggests that whether Bobnar's termination was a result of religious discrimination is inapposite—Bobnar had already been informed that he would be terminated for reasons *other than* his taking FMLA leave. Bobnar has not introduced any evidence showing that Nichols, Wood, or any other AstraZeneca employee terminated him because he exercised his FMLA rights.  *Mullendore*, 872 F.3d at 328 (finding no issue of fact where employee did not demonstrate that termination that "occurred while she was on leave" was "based, in whole or in part, on the fact that the employee took FMLA-protected leave") (citation omitted).

In the Sixth Circuit, an "employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request."  *Mann v. Navicor Group, LLC*, 488 F. App'x 994, 1001 (6th Cir. 2012); *Weimer v. Honda of America Mfg., Inc.*, 356 F. App'x 812, 818 (6th Cir. 2009); *see also* 29 C.F.R. § 825.216 (Department of Labor regulation providing that employees have "no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period").  AstraZeneca has demonstrated that Bobnar was to be terminated for reasons other than his FMLA leave, and as AstraZeneca notes, Bobnar has failed to respond to or even acknowledge AstraZeneca's argument in

this regard. Thus, the uncontroverted evidence shows that although Bobnar was "prevent[ed] from exercising his statutory rights to FMLA leave," Bobnar's termination was not related to his taking FMLA leave. *Id.* Accordingly, the Court grants summary judgment in AstraZeneca's favor as to Bobnar's FMLA interference claim to the extent it is premised on his termination (Count Four).[56]

The Court also concludes that AstraZeneca's contacts do not establish FMLA interference as a matter of law. The Sixth Circuit has noted that "interfering with an employee's exercise of FMLA rights includes . . . discouraging an employee from using [FMLA] leave." *Blank v. Nationwide Corp.*, 2021 WL 3469187, at *6 (6th Cir. Aug. 6, 2021) (internal quotation marks omitted). Discouraging an employee from taking FMLA leave "includes asking an employee to work while they are on protected leave." *Id.* at *6; *cf. Arban v. West Pub. Corp.*, 345 F.3d 390, 402 (6th Cir. 2003) (evidence that plaintiff "was asked to continue to perform work-related tasks while ostensibly on medical leave" and that his supervisor "called him on several occasions and requested that he provide customer lists and pending sales" sufficient for interference).

However, the Sixth Circuit has been sure to clarify that not all employer contacts with an employee constitute *per se* FMLA interference. Indeed, the Sixth Circuit has determined that "an employer can engage in de minimis contact with the employee on leave without violating their FMLA rights." *Blank*, 2021 WL 3469187, at *6; *Groening*, 884 F.3d at 632. Additionally, where a plaintiff's contact with his employer is of his own initiative, it cannot be said that the contact discourages him

---

[56] The Sixth Circuit has concluded that an interference claim may be supported by retaliation if the plaintiff can demonstrate that his employer "somehow used FMLA leave against [him] and in an unlawful manner." *Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 632 (6th Cir. 2018) (original alteration omitted) (quoting *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007)); *Wallner v. Hilliard*, 590 F. App'x 546, 551 (6th Cir. 2014) (finding that firing employee "who has just requested FMLA leave before he can take it" can constitute retaliatory discharge under interference theory). However, as discussed briefly below, because Bobnar has failed to demonstrate a genuine issue of material fact as to his FMLA claim under a retaliation theory, his interference theory cannot rely on it.

from taking leave or interferes with his ability to take FMLA leave. *See Blank*, 2021 WL 3469187, at *6 (plaintiff who in part, while on leave, contacted defendant relating to an ethical complaint he filed only had "*de minimis*" contacts); *Groening*, 884 F.3d at 632 ("[Plaintiff] cannot now claim that the board interfered with her rights by responding to discussions *she* initiated"); *see also Rose v. Univ. Hosps. Physician Servs.*, 2022 WL 18228282, at *3 (6th Cir. July 28, 2022) (affirming grant of summary judgment to employer where plaintiff initiated "many of the[] communications" with work colleagues during her leave). Thus, if an employee performs work during FMLA-approved leave, such will generally only rise to the level of an actionable interference if the employer required or asked for it. *See Rose*, 2022 WL 18228282, at *3; *Groening*, 884 F.3d at 632–22.

In this case, Bobnar spent, over the course of his 16 days of FMLA leave, approximately 10 hours communicating with AstraZeneca employees. (Bobnar Dep. at Tr. 270–71.) And Bobnar indicated half of this time, or 5 hours, was spent discussing with Wood about Bobnar's "off-boarding" process, which included meeting Wood at a coffee shop to give him the destroyed company credit card, fill out his termination documents and expense reports, and return the company car. (*Id.* at Tr. 266–67; Bobnar Decl. at ¶¶ 6–7.)

The Court finds that these contacts, in the 5 hours spent "off-boarding," were *de minimis*. "[T]here is no right in the FMLA to be 'left alone,' and be completely absolved of responding to an employer's discrete inquiries. *Raleigh v. SEIU*, 2021 WL 4458669, at *4 (E.D. Mich. Sept. 29, 2021) (quoting *Callison v. City of Philadelphia*, 430 F.3d 117, 121 (3d Cir. 2005)); *Allen v. Butler County Com'rs*, 331 F. App'x 389, 394–97 (6th Cir. 2009) (adopting the Third Circuit's approach in *Callison*). And when contacts are "limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments," the FMLA is not violated. *See Reilly v.*

*Revlon, Inc.*, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009); *see also Vess v. Scott Medical Corp.*, 2013 WL 1100068, at *3 (N.D. Ohio Mar. 15, 2013) ("When such contact is limited to the scope of passing on institutional knowledge to new staff, or providing closure on completed assignments, employers do not violate the FMLA by making such calls.") (internal quotation marks omitted).  Bobnar concedes that these 5 hours involved some form of off-boarding or "transitioning-related tasks." (Doc. No. 37 at PageID# 928.)  And Bobnar has not shown or argued that these 5 hours of off-boarding tasks constituted "required" work.  Indeed, these off-boarding-related contacts were nothing more than *de minimis* and do not establish interference as a matter of law.  *See Reilly*, 620 F. Supp. 2d at 537 (no interference where plaintiff was called and visited by temporary replacement to ask where files were located in computer).

According to Bobnar, the remaining 5 hours were more "substantive."  (Bobnar Decl. at ¶ 8.) Bobnar asserts that, in part, he was "required" to transfer scheduled lunch and coffee appointments to coworkers, including office and customer contact information.  (*Id.* at ¶¶ 6, 8.)  But these tasks still amount to the type of limited-scope "passing on [of] institutional knowledge" that is *de minimis* in nature.  *Corpus v. Aim Leasing Co.*, 2021 WL 3737911, at *4 (N.D. Ohio Aug. 24, 2021) ("The general consensus among courts is that reasonable contact limited to . . . passing along institutional or status knowledge will not interfere with an employee's FMLA rights . . . .") (citation omitted); *Vess*, 2013 WL 1100068, at *3.  Indeed, Bobnar explained during his deposition that he had lost access to AstraZeneca's server during his FMLA leave, which suggests that he did not possess the full working capabilities of a regular employee during his leave.  (Bobnar Dep. at Tr. 266.)  *See Reilly*, 620 F. Supp. 2d at 537 (finding that plaintiff was not required to perform and did not perform any work based in part on her "never us[ing] the computer she had at home to produce any work").

70

Bobnar also asserts that these 5 substantive hours included "discussing with a co-worker specific marketing and sales initiatives for certain customers" and receiving "multiple calls" from coworkers regarding "normal sales activities." (Bobnar Dep. at Tr. 266–67; Bobnar Decl. at ¶ 6.) While some of these tasks could theoretically be substantive, Bobnar does not indicate how many of these calls were had, how long any call lasted, or that these calls were anything more than simple tasks. *See Corpus*, 2021 WL 3737911, at *4;[57] *see also Jones v. Progressive Cas. Ins. Co.*, 2019 WL 4684459, at *5 n.7 (E.D. Ky. Sept. 24, 2019) (observing that it was "critical" to entry of summary judgment on interference claim that defendant "was only able to effectively contact [plaintiff] during his leave on a few occasions"); *Eichbauer v. Henry Ford Health Sys. & Henry Ford Hosp.*, 2017 WL 3642185, at *7 n.2 (E.D. Mich. Aug. 24, 2017) (single call from supervisor requesting to know date of plaintiff's return from leave and "requiring submission of medical documentation" not interference).

"Fielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights." *Vess*, 2013 WL 1100068, at *3 (quoting *Reilly*, 620 F. Supp. 2d at 537) (alterations omitted). The Sixth Circuit has opined that, "under certain circumstances, multiple phone calls from an employer and demands to complete more than simple tasks could rise to the level such that an employee's FMLA leave becomes unjustifiably disrupted and thereby discouraged," but this is not the case here. *Tilley*, 654 F. App'x at 680; *cf. Reilly*, 620 F. Supp. 3d at 537 (phone calls that were "infrequent and in brief duration" insufficient

---

[57] In *Corpus*, the plaintiff's supervisor sent multiple emails to the plaintiff while he was on FMLA leave asking for customer contact names and pending proposals. 2021 WL 3737911, at *4. The court determined that these requests were *de minimis* contacts constituting requests to pass on institutional knowledge. *Id.* Thus, the supervisor's actions did not support an FMLA interference claim because they were not requests for the "employee to perform work while on leave." *Id.*

for interference).  Bobnar even admitted that although each of his team members called him after they found out about his termination, he could have declined to answer their calls.  (Bobnar Dep. at Tr. 271–72.)  And because Bobnar explained that at least some of these communications were not harassment, (Bobnar Dep. at Tr. 272), it is unclear whether Bobnar considered these calls "work" to begin with.  To the extent Bobnar accepted these calls or decided of his own volition to have these discussions, such was "h[is] prerogative," and cannot substantiate FMLA interference.  *Groening*, 884 F.3d at 632 (plaintiff's attending a board meeting and contacting board about work-related matters was "her prerogative, and she cannot now claim that the board interfered . . . by responding to discussions *she* initiated").

The only indication that Bobnar did not have a choice in speaking with his coworkers is his assertion that he was "required to" work the entire 10 hours, to include the 5 non-off-boarding hours, which is conclusory.  (Bobnar Decl. at ¶¶ 6–8; Doc. No. 37 at PageID# 927.)  Bobnar does not provide evidence or details as to who "required" him to perform these tasks .  Indeed, at his deposition, Bobnar indicated that "nobody" told him that he needed to have these conversations, and that he could have had them before he took leave.[58]  (Bobnar Dep. at Tr. 275.)  *See Grindstaff v. Sun Chem. Corp.*, 2010

---

[58] Even if Bobnar's declaration averment was not considered conclusory, it would still not pass muster considering Bobnar's deposition testimony.  Bobnar explicitly testified that "nobody told me I had to have conversations," and that he could have not answered many of the calls from his co-workers, which he considered not to be harassment.  (Bobnar Dep. at Tr. 272–75.)  Thus, Bobnar's deposition testimony directly contradicts his declaration that he was "required" to do anything.  Further, even if this Court finds that Bobnar was required to take the calls—which it does not—that would not salvage Bobnar's claim.  Bobnar's deposition testimony indicates that the minimal calls from his co-workers related to calendar appointments that had already been scheduled, given that his entire team learned that Bobnar was "leaving the company."  (*Id.* at Tr. 271–75.)  Bobnar went on to testify that he could have had these conversations before he went on leave, and in-fact did so for some appointments.  (*Id.* at Tr. 275.)  These minimal conversations relating to transitioning existing obligations involve "institutional knowledge" that the FMLA permits to be passed on.  *See, e.g., Corpus*, 2021 WL 3737911, at *4 (numerous emails to plaintiff asking for current customer contact names and pending proposals insufficient because they constituted requests "to pass on institutional knowledge" rather than "to perform work while on leave"); *cf. Vess*, 2013 WL 1100068, at *4 (finding issue of fact where "Plaintiff's testimony [] revealed something more: namely, that Neeb and others requested Plaintiff complete training prior to her return from leave, complete reviews of respiratory therapists and enter blood gas data").  Accordingly, the Court finds that Bobnar has failed to establish a claim for FMLA interference.

WL 4878953, at *14 (S.D. Ohio Nov. 22, 2010) (no interference where, in part, plaintiff admitted that he was not required to attend single lunch meeting with supervisor). Bobnar's conclusory assertion cannot now create a factual issue.

Based on this record, the Court concludes that AstraZeneca did not require Bobnar to work during his FMLA leave, and therefore, did not interfere with Bobnar's leave. The "work" Bobnar performed was either voluntarily accepted by Bobnar or related only to the passing on of institutional knowledge given Bobnar's pending termination. Accordingly, because Bobnar cannot show that AstraZeneca denied him FMLA leave or benefits to which he was entitled, he has failed to demonstrate an issue of fact on his FMLA interference claim. The Court grants summary judgment in AstraZeneca's favor as to Bobnar's FMLA interference claim as it relates to AstraZeneca's contacts with him during his FMLA leave (Count Four).

### 2. FMLA Retaliation

As for Bobnar's allegation in his Complaint that he was terminated as an act of retaliation for taking FMLA leave, the Court's conclusion remains the same. To establish a *prima facie* case of retaliation under the FMLA, Bobnar must show that "(1) he engaged in an activity protected by the [FMLA]; (2) Defendant took an adverse employment action against him; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Hodnett v. Chardam Gear Co.*, 749 F. App'x 390, 393–94 (6th Cir. 2018). For the same reasons described above concerning Bobnar's failure to demonstrate causation between his FMLA leave and his termination, the Court finds that no genuine issue of material fact exists as to whether Bobnar was retaliated against for taking FMLA leave. Accordingly, the Court grants summary judgment in AstraZeneca's favor as to Bobnar's FMLA claim to the extent it is premised on a retaliation theory (Count Four).

73

**D.     Breach of Contract and/or Failure to Pay Wages in Violation of O.R.C. 4113.15 (Counts Five and Six)**

In Counts Five and Six, Bobnar alleges that AstraZeneca breached a contract and/or violated Ohio Revised Code 4113.15, or Ohio's Prompt Pay Act ("OPPA"), by refusing to pay him a bonus he earned pursuant to the FSIP concerning the payment of bonus or incentive compensation based upon objective sales performance criteria.  (Doc. No. 1 at ¶¶ 84–92.)

Bobnar and AstraZeneca each move for summary judgment on Count Five.  (Doc. Nos. 33-1, 36-1.)

"Under Ohio law,[59] the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach."  *Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*, 569 F. App'x 438, 441 (6th Cir. 2014) (quoting *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)).

In this case, it is undisputed that the FSIP is an agreement between AstraZeneca and Bobnar that controls the provision of Bobnar's bonuses as long as he meets certain bonus thresholds in a given quarter and is employed through the end of said quarter.  (*See generally* Nichols Decl. Ex. 1.)  The parties also do not dispute that Bobnar met his bonus targets for Q1 2022 and was employed throughout the last day of Q1 2022, or March 31, 2022, and that June 30, 2022, was the expected bonus payout date for Q1 2022.  The parties also do not dispute that Bobnar was no longer employed

---

[59] The FSIP states that it shall be construed in accordance with the laws of Delaware.  (Nichols Decl. Ex. 1 at PageID# 1118.)  However, the parties cite and reference only Ohio law in their briefings, and neither party cites or argues that Delaware law should apply.  (Doc. Nos. 33-1, 36-1, 37, 39, 40, 41.)  Accordingly, the Court will apply Ohio law to Bobnar's breach of contract claim.  *See Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019) (observing that courts "regularly rely on the litigants' agreement about the governing law (or, more often, on one litigant's failure to dispute the issue) to avoid deciding what could be knotty choice-of-law questions").

by June 30, 2022 (the payout date for Q1 2022 bonuses), and that termination "for cause" prior to the payout of an earned bonus would forego Bobnar's entitlement to it.  (Doc. No. 36-1 at PageID# 779; Doc. No. 33-1 at PageID# 317.)

The parties disagree, however, as to whether Bobnar's termination after his Request was denied constitutes "for cause" as defined by the FSIP.  The FSIP provides that an employee that is terminated "for cause" is ineligible "to receive any award not paid out prior to the time of such Separation from Employment, regardless of whether or not such award has been determined or is determinable."  (Nichols Decl. Ex. 1 at PageID# 1115.)  Under the FSIP, a discharge is "for cause" if it is based on an:

> Employee's dishonesty, insubordination, gross mismanagement, deliberate and premeditated acts against the interests of the Company, gross and repeated violation of the Company's policies, procedures, or recognized standard of behavior, misconduct related to the Employee's employment, or commission of a felony, as determined in each case in the sole discretion of the Company.

(Nichols Decl. Ex. 1 at PageID# 1104.)

Bobnar argues that he was entitled to the Q1 2022 bonus but that AstraZeneca failed to pay him and did so without legal justification.  (Doc. No. 33-1 at PageID# 317–18.)  Bobnar insists that the FSIP's terms make it clear that a "for cause" termination "must be determined for significant wrongdoing, such as dishonesty, insubordination and the like before the employee loses the earned bonus."[60]   (Doc. No. 40 at PageID# 1125; Doc. No. 37 at PageID# 926.)  AstraZeneca instead contends that "gross and repeated violations of the Company's policies," in particular referring to

---

[60] Bobnar refers to the term "Separation from Employment for Cause."  (Doc. No. 40 at PageID# 1125.)  This refers to the FSIP's definition of a "Termination for Cause (Discharge)."  (Nichols Decl. Ex. 1 at PageID# 1115.)

Bobnar's refusal to receive the vaccine in violation of the Mandate, indicate that Bobnar's termination was "for cause."  (Doc. No. 41 at PageID# 1149.)

The Court agrees with Bobnar.  As the Court has already concluded, the record shows that AstraZeneca discriminated against Bobnar when it denied his Request for a religious accommodation and later discharged him for failing to comply with the Mandate.  "Termination of employment premised on unlawful discrimination or retaliation is undoubtedly 'without good cause.'"  *Krause v. UPS Supply Chain Sols., Inc.*, 2009 WL 3578601, at *15 (D. Mass. Oct. 28, 2009).[61]  It would strain credulity to find that, although AstraZeneca's termination of Bobnar was discriminatory, it was nevertheless done "for cause."  Therefore, regardless of whether Bobnar engaged in "gross and repeated violations" of AstraZeneca's Mandate, the Court holds that because Bobnar's termination was unlawful, it was therefore not "for cause."  And because AstraZeneca does not dispute whether Bobnar satisfied the other requirements to receive a Q1 bonus (e.g., that he satisfied certain sales benchmarks and was employed through the end of Q1 2022), under the terms of the FSIP, Bobnar is entitled to his Q1 2022 bonus.  Accordingly, the Court grants summary judgment in favor of Bobnar on his breach of contract claim (Count Five).[62]

---

[61] Indeed, courts within this Circuit have found that a retaliatory discharge is prohibited even when firing an at-will employee, who may normally be fired *without* cause.  *See, e.g., Crook v. Simpson Strong-Tie Co., Inc.*, 2012 WL 123988, at *10 (M.D. Tenn. Jan. 17, 2012) ("The cause of action for retaliatory discharge provides 'a narrow exception to the employment at will doctrine,' under which an employer presumptively may terminate an employee for good cause, bad cause, or no cause at all.") (alterations omitted); *Turner-Meadows v. General Motors, LLC*, 786 F. App'x 592, 596 (6th Cir. 2019) (similar); *Canady v. Gillette Co.*, 547 F. App'x 670, 678 (6th Cir. 2013) (similar); *Perry v. Young Touchstone Co.*, 846 F. Supp. 2d 922, 928 (W.D. Tenn. Feb. 10, 2012) (similar).  Thus, it logically follows that a retaliatory or discriminatory discharge cannot possibly constitute a discharge "for cause" as AstraZeneca asserts.

[62] Additionally, AstraZeneca claims that Bobnar's statement in his Motion for Partial Summary Judgment that "it is undisputed Bobnar was fired, with cause, for refusing to take the vaccine" is a concession that "he was terminated for cause."  (Doc. No. 39 at PageID# 964 (citing Doc. No. 33-1 at PageID# 315).)  As noted above, however, Bobnar's representation is inconsistent with his many other briefings on the issue, so the Court will not construe this as an "admission."

AstraZeneca also moves for summary judgment on Count Six, Bobnar's claim for a violation of the OPPA.[63]  (Doc. No. 36-1 at PageID# 780.); O.R.C. § 4113.15.  In particular, AstraZeneca argues that the OPPA "expressly applies only to wages that are not in dispute," and that because Bobnar is not entitled to the Q1 2022 bonus, his OPPA cause of action is precluded.  (Doc. No. 36-1 at PageID# 780 (citation omitted).)

The OPPA, "among other requirements, requires employers in Ohio to pay their employees the preceding month's wages by the first day and fifteenth day of the month." *Stang v. Paycor, Inc.*, 582 F. Supp. 3d 563, 567 (S.D. Ohio 2022) (citing O.R.C. § 4113.15(A)).  The OPPA further provides, in relevant part, that:

> "Where wages remain unpaid for thirty days beyond the regularly scheduled payday . . . *and no* contest, court order, or *dispute* of any wage claim . . . *exists accounting for nonpayment*, the employer, in addition, as liquidated damages, is liable to the employee in an amount equal to six per cent of the amount of the claim still unpaid and *not in contest or disputed* or two hundred dollars, whichever is greater."

*O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 578–79 (6th Cir. 2009) (quoting O.R.C. § 4113.15(B)) (emphasis added) (alterations omitted).  Thus, the OPPA does not allow an employee to recover liquidated damages if the allegedly unpaid wages are in dispute.[64]  *See O'Brien v. Ed Donnelly*

---

[63] In its Reply, AstraZeneca refers to Bobnar's Ohio Prompt Pay Act ("OPPA") claim as "Count V."  (Doc. No. 41 at PageID# 1149 n.3.)  Because Bobnar alleges claims for breach of contract and a violation of the OPPA as "Counts Five and Six," and Bobnar moves for summary judgment on his breach of contract claim, which he refers to as "Count Five," the Court construes Bobnar's Complaint as alleging a breach of contract claim as Count Five, and a claim under the OPPA as Count Six.  (Doc. No. 1 at PageID# 14; Doc. No. 33-1 at PageID# 317–18.)

[64] The Court is aware of a district court case within this Circuit that reached the opposite conclusion and permitted a claim to be brought under § 4113.15 when wages were in dispute, notwithstanding the Sixth Circuit's guidance in *O'Brien*.  *See Monahan v. Smyth Automotive, Inc.*, 2011 WL 379129 (S.D. Ohio Feb. 2, 2011).  In *Monahan*, upon evaluating a motion to dismiss, the Court was unpersuaded that the plaintiff's claim had to be dismissed because a dispute as to the wages existed.  *Id.* at *9.  Specifically, the court opined that such an interpretation would be contrary to the legislature's intentions of providing employees with an avenue for relief if employers failed to pay them properly.  *Id.*  This Court declines to follow *Monahan*.  It is widely acknowledged that *Monahan* conflicts with *O'Brien*, and thus, *O'Brien* controls.  *See Sutka*, 256 F. Supp. 3d at 682 ("To the extent that *Monahan* stands for the proposition that barring OPPA claims based on disputed wages undermines the statute itself, *Monahan* is in conflict with *O'Brien*, and *O'Brien*'s interpretation of the OPPA is binding on this Court."); *Jenkins v. EVO Services Group, LLC*, 2024 WL 691350, at *4 (S.D. Ohio Feb.

*Enters.*, 575 F.3d 567, 578–79 (6th Cir. 2009) (affirming district court's grant of summary judgment on OPPA claim where it concluded that a "contest or dispute regarding defendant's liability for further wages accounted for its nonpayment"), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016); *Sutka v. Yazaki N. Am., Inc.*, 256 F. Supp. 3d 677, 683 (E.D. Mich. 2017).

The Sixth Circuit has alluded to narrow exceptions to this rule where there is no true dispute. *See O'Brien*, 575 F.3d at 578.  For example, suppose an employer promised to pay a certain sum and the employee agreed that this sum was their due wage, but a clerical glitch prevented the sum from being paid—such an employer could not maintain that a "dispute" accounted for nonpayment.  *Id.* Similarly, if an employer was forced to delay payment because they were short on cash, yet had conceded the employee's entitlement to payment, there could be no "dispute" accounting for nonpayment.  *Id.*  Notably, the narrow exceptions described by the Sixth Circuit all involve situations where the employer and employee *agree* that the employee has the right to the payment.  *Id.*  But where the employer does in-fact dispute the employee's right to the wages, damages are not recoverable under § 4113.15(B).[65]

---

20, 2024) (same); *In re Lowe's Companies Inc. Fair Labor Standards Act and Wage and Hour Litigation*, 517 F. Supp. 3d 484, 514 (W.D. N.C. 2021) ("Whatever persuasive force the reasoning in *Monahan* might have, the Court is bound to follow the Sixth Circuit's decision in *O'Brien*."); *see also Garner v. Cleveland Clinic Foundation*, 2024 WL 2803376, at *9 (N.D. Ohio May 29, 2024) (rejecting interpretation that the OPPA presents separate causes of action in Paragraph A versus Paragraph B).  Further, *Monahan* involves a motion to dismiss, not summary judgment, and is thereby distinguishable.

[65] *See id.* at 578–79; *see also Lower v. Electronic Data Systems Corp.*, 494 F. Supp. 2d 770, 775 (S.D. Ohio 2007) ("§ 4113.15 expressly applies only to wages that are not in dispute.  Even if the bonus to which Plaintiff believes he is entitled is properly considered part of his wages, the fact of his entitlement thereto is very much in dispute, and therefore outside the scope of § 4113.15.") (citations omitted); *In re Lowe's Companies Inc. Fair Labor Standards Act and Wage and Hour Litigation*, 517 F. Supp. 3d at 515 ("Therefore, *regardless of the merits of the parties' positions*, it is plainly a bona fide dispute that, in accordance with *O'Brien*, means that Plaintiffs cannot recover liquidated damages or other remedies under section 4113.15(B) of the OPPA.") (emphasis added); *Sutka*, 256 F. Supp. 3d at 683 (dismissing plaintiff's OPPA claim because a dispute accounting for nonpayment "precludes the recovery of liquidated damages" and "Plaintiff has not alleged that Defendant conceded that he was owed unpaid wages . . . or that an administrative error accounted for

In this case, the Court finds that a "contest or dispute regarding [AstraZeneca's] liability for further wages accounted for its nonpayment." *O'Brien*, 575 F.3d at 579.  Indeed, AstraZeneca, at the time of the nonpayment, disputed whether Bobnar was entitled to the Q1 2022 bonus.  And Bobnar, in his Opposition to AstraZeneca's Motion for Summary Judgment, does not contest AstraZeneca's assertions that a dispute existed regarding the Q1 2022 bonus, let alone address its claim for OPPA damages at all.  (*See* Doc. No. 37.)  Moreover, Bobnar asserts none of the narrow exceptions to this rule as described in *O'Brien*—he does not assert any clerical errors, nor does he assert that AstraZeneca delayed his payments while conceding that he was entitled to them.  *See O'Brien*, 575 F.3d at 578.

Accordingly, the Court grants AstraZeneca's Motion for Summary Judgment as to Bobnar's claim under the OPPA (Count Six).

## V.    Conclusion

For the reasons set forth above, the Court **GRANTS** Bobnar's Motion for Partial Summary Judgment, as to his claims for Title VII religious discrimination/failure to accommodate (Count One) and breach of contract (Count Five).  (Doc. No. 33.)

The Court further **GRANTS** AstraZeneca's Motion for Summary Judgment as to Bobnar's claims for Title VII retaliation (Count Two), FMLA interference/retaliation (Count Four) and violation of Ohio's OPPA (Count Six), and **DENIES** AstraZeneca's Motion for Summary Judgment as to Bobnar's claims for Title VII religious discrimination/failure to accommodate (Count One) and

---

Defendant's failure to pay the wages at issue"); *Jenkins*, 2024 WL 691350, at *3–4 (similar); *Hollar v. Central Ohio Trauma System*, 2020 WL 3470393, at *7 (S.D. Ohio Apr. 15, 2020) (similar); *Rangel v. Paramount Heating & Air Conditioning, LLC.*, 2020 WL 1080418, at *10 (S.D. Ohio Mar. 6, 2020); *Garner*, 2024 WL 2803376, at *10 (concluding that allegation of non-payment being dependent on "issues of law and fact . . . demonstrate[s] the unpaid wages at issue are in dispute").

breach of contract (Count Five).  (Doc. No. 36.)

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
Date: November 26, 2024          U. S. DISTRICT JUDGE